DELLS PAPER & PULP COMPANY, Respondent, vs. WILLOW
RIVER LUMBER COMPANY, Appellant.

*May 1—November 4, 1919.*

*Specific performance: Sale of logs and pulp wood: Exhaustion of
contract remedy: Adequate remedy at law: Contracts: En-
forceability: Time of determination of validity: Construction
by parties: Award of damages: Venue: Place of trial: County
where action was begun: Courts: Special term: Logs and log-
ging: License to enter and cut: Revocability.*

1. If no steps were taken to change the venue, an action is prop-
   erly triable in the county where it was begun.
2. An action to compel specific performance of a contract to sell
   lumber or pulp wood and to enjoin defendant from interfer-
   ing with the plaintiff exercising its contract rights, properly
   triable in the county where it was begun, may be tried, under
   sec. 113.11, Stats., in another county of the same circuit at a
   general term of court; the general term for one county being
   a special term for the other.
3. The purchaser of logs and pulp wood from the defendant lum-
   ber company is not obliged first to exhaust its remedy under
   the contract by cutting the timber itself or attempting to go
   on defendant's lands for that purpose, the lumber company
   having expressly revoked, canceled, and terminated the pur-
   chaser's license to cut the timber.
4. In this case the purchaser, suing for specific performance of
   the contract, has not an adequate remedy at law as plain,
   adequate, and as practical and efficient to the ends of justice
   and its prompt administration as the equitable remedy.
5. The contract is not so indefinite and uncertain as to be incapa-
   ble of specific performance by the lumber company at the suit
   of the plaintiff paper company because of options to be exer-
   cised by the lumber company, most of the uncertainties com-
   plained of arising by reason of the lumber company's wilful
   breach, and the contract providing for all reasonable contin-
   gencies.
6. A clause in the contract permitting the paper company to enter
   upon the lumber company's lands and cut the timber it had
   purchased is more than a mere license, it being a privilege
   incident to a valid grant, evidenced by a written instrument,
   supported by a valid consideration, has been acted upon by
   the plaintiff, and is therefore not revocable.

7. Where it is claimed that a contract would tend to foster a monopoly, its validity must be determined as of the time when it was made and not as of the time when specific performance is sought.

8. The paper company is entitled to specific performance of the contract, which is definite and certain, its legal remedy being inadequate and valuable rights under the contract being preservable to it in no other way, the contract having been performed by the lumber company for seven years and finally breached only on account of an advance in the price of logs and pulp wood.

9. The court having taken jurisdiction for the determination of the equitable issues involved in a suit for specific performance, properly determined and awarded damages sustained by the plaintiff from the time of the breach by defendant to the date of the judgment.

10. Where a lumber company operated a logging railway for seven years and without objection made settlement on a certain basis with the purchaser of logs and pulp wood from it and a railway company which carried the logs from the end of the logging road to the purchaser, such acquiescence is conclusive against the lumber company as to the basis on which the contract freight rate was to be apportioned between its logging road and the purchaser in the latter's suit for specific performance.

APPEALS from a judgment and an order of the circuit court for Eau Claire county: CHESTER A. FOWLER, Judge. *Order affirmed; judgment modified and affirmed.*

The appeals were from a temporary injunctional order and from the final judgment in the same action and were heard together.

The plaintiff corporation is engaged in operating a paper and pulp mill in the city of Eau Claire. The defendant corporation is the owner of a large amount of timber lands and is engaged in operating sawmills, planing mills, and in carrying on a general lumber business at Hayward, Wisconsin. On October 26, 1909, the plaintiff as party of the second part, and the defendant as party of the first part, entered into a contract the principal provisions of which are as follows:

"The said first party [defendant] does hereby agree to

sell to the party of the second part [plaintiff] the timber, logs, and pulp wood hereinafter described, to cut said timber into logs and pulp wood, to load said logs and pulp wood on cars and deliver the same to the party of the second part" at the place specified. "Said timber, logs, and pulp wood are described as follows: one hundred million feet of hemlock logs located on the lands of said first party, a description of which lands is contained in the paper hereto annexed and marked Exhibit A; also all spruce and balsam timber suitable for either logs or pulp wood of the kind hereinafter specified located on said lands; also such hemlock pulp wood of the kind hereinafter specified as the said first party may at its option desire to cut from said lands, and also all sound green hemlock logs and pulp wood of the kind hereinafter specified which said first party shall cut and deliver from said lands." .

The contract then provides the size and length of the logs, the kind of timber from which it shall be cut, how various adjustments as to broken logs and crooked logs shall be made, the length and dimensions of the pulp wood from hemlock, spruce, balsam, and tamarack; that the lands shall be cut clean as the logging operations progress, how the same shall be scaled and measured, and provides that "the first party shall deliver said logs and pulp wood between the 1st day of May, 1910, and the 1st day of January, 1926, all deliveries to be made between the 1st day of May and the 1st day of January in equal amounts each month as far as possible." In 1910 to 1913, both inclusive, four million feet of hemlock logs were to be delivered annually. From 1915 to 1925, both inclusive, seven million feet of logs were to be delivered annually. The contract further provides as to how the logs shall be loaded on cars, and continues:

"The party of the second part, in consideration of the promises and agreements on the part of the first party, hereby agrees to purchase said hemlock, spruce, balsam, and tamarack logs and pulp wood which the said first party agrees to sell and deliver as aforesaid, and to pay for the same on the 10th day of each month in cash for all logs and pulp wood delivered during the previous month,"

on a basis of a scale of prices running upwards from $11 per thousand feet for hemlock, balsam, and tamarack and $17.50 per thousand feet for spruce logs, to $13 per thousand feet for hemlock logs, to $12.50 per thousand feet for balsam and tamarack logs, to $19 per thousand feet for all spruce logs. There was also a graduated scale of prices for the pulp wood. The contract further provided that in case the first party should purchase additional lands it might furnish the logs and pulp wood described in the contract from such acquired lands. There was also a provision that if the timber should be destroyed by act of God the first party should be relieved to that extent from making delivery. The first party reserved the right to peel the hemlock logs, and in the event that it chose not to peel them the second party had the right to peel. The cars were required to be loaded to the minimum and not beyond the maximum capacity of each car. The first party agreed to pay the taxes and assessments levied against the lands, and timber, logs, or wood cut therefrom and not delivered prior to the 1st day of May each year. The first party warranted the title to all of the timber, logs, and pulp wood that should be delivered under the contract. The contract then provides:

"In case of any default of said first party, its successors or assigns, in cutting or delivering any of said logs or pulp wood, said second party, its successors and assigns, shall be, and is, hereby authorized to enter upon said lands and cut, remove, and load on cars as aforesaid all logs and pulp wood of the kind and character hereinafter described for the fulfilment of said contract, in any year in which a default may exist, and for such work said second party shall be allowed and be paid the actual cost therefor and ten per cent. thereof in addition as compensation for such work; but if said second party shall on account of such default enter upon said lands and cut and remove said timber, it shall be authorized to make its own selection of said hemlock logs and shall not be required to cut over more land than is necessary to obtain the amount of hemlock logs required to fulfil the terms of this contract."

The second party agreed to furnish and keep in repair one half of the cars necessary for the shipment of the logs and wood and to unload all cars promptly. The first party agreed that no cars should be loaded with more than one kind of timber, and that in shipments- of pulp wood cars were to be loaded with one length of wood, all logs to be stamped by first party.

Prior to the making of the contract of October 26, 1909, a- contract for a joint rate had been agreed upon, which was not then reduced to writing but was signed and dated November 27, 1909, by which the plaintiff agreed that it would deliver to the Superior & Southeastern Railway Company the materials specified in the contract loaded on flat cars, the same to be transported to Grand View station and there to be delivered by the Superior & Southeastern Railway Company to the Omaha Company. Plaintiff further agreed to pay the Omaha Company and the Superior & Southeastern Railway Company for the transportation of such logs and pulp wood four cents per hundred pounds, of which the Omaha Company was to receive two and one-half cents and the Superior & Southeastern Company one and one-half cents per hundred pounds. The contract was executed by the plaintiff and the Omaha Company and the Superior & Southeastern Railway Company, George C. Glover being president of the Superior & Southeastern Railway Company and also president of the defendant company.

The parties proceeded with the performance of the contract down to October 9, 1917, on which day the defendant wrote the plaintiff as follows:

"Owing to the fact that you have not unloaded the cars of pulp wood shipped you and it has been necessary for us to tie up our loaders and discharge the crew, we therefore notify you that since you have violated the contract we will refuse to further ship you logs on the same."

On the 14th day of December, 1917, this action was begun, and upon affidavits and pleadings an interlocutory or-

der was made requiring the defendant to show cause why it should not be enjoined from interfering during the pendency of the action with the entry of the plaintiff upon the lands described in the contract and from cutting and removing therefrom the logs and pulp wood described in the contract, and enjoining the defendant from selling any of its hemlock *saw logs or other timber* standing or being on the lands described in the contract. The defendant answered, filed counter affidavits, and the matter was finally brought on for hearing. Meanwhile the parties entered into a contract which was to be without prejudice, by which the defendant was to furnish the logs required under the contract for which the plaintiff was to pay $14.75 per thousand feet, it being agreed that if it was finally determined that the contract was enforceable the defendant would repay to the plaintiff the excess received by it over the contract prices. On the hearing the court ordered the defendant to continue with the performance of the contract, the same to be paid for as agreed between the parties at the rate of $14.75 per thousand feet. It was further provided that if the defendant elected not to furnish the logs and timber as ordered by the court, then the plaintiff might enter upon the defendant's lands and cut and get out such logs in the manner provided by the contract, and restrained the defendant from interfering therewith, and the defendant was enjoined from disposing of either its logs or its lands in such quantity or manner as would prevent it from supplying the logs and timber to the plaintiff during the term of the contract; the order to become operative upon the plaintiff filing a bond in the sum of $100,000. The bond was filed and the case was tried.

The court found that the plaintiff had been engaged for many years in manufacturing paper from pulp wood and in the manufacture of pulp; that to operate plaintiff's mill and grind its pulp wood requires a large amount of power,

secure which the plaintiff entered into a ninety-nine-year lease with the city of Eau Claire for power generated by the Dells dam; that to utilize the power so leased the plaintiff had constructed a large and expensive manufacturing plant, to operate which required substantially seven million feet of hemlock pulp per year, and by reason of extensions will require from twelve to fourteen million feet per year in the future. That the supply of available raw material is being rapidly consumed, and that at the present rate of consumption little will be available in the open market after ten years.

That during 1909 the plaintiff, for the purpose of extending the life of its plant and the use of its lease, was buying timber lands; that because of the contract entered into between the plaintiff and the defendant such negotiations were broken off.

That the contract of October 26, 1909, was executed, acknowledged, and duly recorded in the office of the register of deeds of Ashland and Bayfield counties. That, relying upon the contract, the plaintiff limited its purchases of pulp wood and pulp-wood lands and made no other provision to supply its plant during the period covered by the contract. That since the making of the contract the price of pulp wood and pulp-wood lands has largely increased, and that if the contract is not performed plaintiff cannot supply its mills except at prices which will endanger its ability to manufacture pulp wood in competition with other manufacturers.

That if the defendant does not perform the contract of October 26, 1909, it will result in a large loss to the plaintiff, not now ascertainable or determinable, by reason of endangering the length of life of its plant and its ability to utilize its water-power lease. That plaintiff cannot now and could not since October 9, 1917, make contracts for a period or except from year to year, and that the defendant had per-

formed its contract down to October 9, 1917. That plaintiff had substantially performed the contract on its part, such delays as occurred being slight and inconsequential and being fully waived by the defendant. That until the fall of 1917 the contract had been carried out by both parties in a spirit of mutual accommodation, and that the accommodations received by the defendant from the plaintiff were fully equivalent to those that had been conferred by the defendant upon the plaintiff.

That plaintiff was not in default on the 9th day of October, 1917, except for payment of one car of logs amounting to substantially $45, which through mistake had been delivered to the wrong place by the railway company. That the plaintiff had not, shortly prior to October 9, 1917, notified the defendant not to ship any further logs under the contract or arbitrarily directed it to withhold shipments, but such requests as were made were made pursuant to and in reliance upon the spirit of mutual accommodation that had theretofore obtained between the parties.

That on November 9, 1917, the defendant gave the notice heretofore described, and that on October 15, 1917, the defendant further notified plaintiff to the effect that it would not perform said contract, alleging as a reason therefor that the plaintiff had failed to furnish its one-half of the cars required for service under the contract; that none of the reasons assigned by the defendant were well founded in fact or set forth the motive of the defendant for its refusal, but the motive in fact for such refusal was that the cost of getting out the timber had so increased through rise in prices of labor and supplies that the price of logs under such contract was then about $3 per thousand feet below the market price, and that the refusal of the defendant to further perform was arbitrary and unjustifiable, and that since October 9, 1917, the defendant has ever refused to perform said contract and continued in its repudiation thereof and has

continuously denied the plaintiff any rights thereunder, including the right to enter upon the lands described in the contract and cut therefrom the timber required by said contract.

That immediately upon receipt of such notice from the defendant the plaintiff made diligent effort to procure timber elsewhere and did procure seven million feet at a price of $15.50 per thousand feet f. o. b. Morse, which was then a reasonable and fair price therefor, three million feet of which were delivered to the plaintiff during the year 1917, and by means of which the plaintiff was enabled to keep its plant in operation. That the arrangement between plaintiff and defendant heretofore stated was entered into by which plaintiff was to pay $14.75 per thousand feet, and that the order requiring the defendant to deliver logs at the agreed price of $14.75 per thousand feet was entered as stated.

That the defendant owns property consisting of timber lands and manufacturing plant at Hayward, Wisconsin; that it is converting a large portion of its standing timber into lumber and selling the same, and that when the last of its timber is cut the plant will be of but little value, and "if the defendant, between now and the time when such contract will expire by limitation, divides its surplus and profits with its stockholders, it is extremely doubtful whether it will be financially able to pay the plaintiff the damages it has sustained and will sustain if the defendant is not compelled by decree of this court to perform its said contract."

That it is impossible to determine the market value of the logs specified in the contract; that it is uncertain whether, after a period of ten or twelve years, paper and pulp manufacturers will be able to get any substantial portion of their supply in the open market; that the only other available supply is Canada, which is subject to export laws of the Canadian government and to tariff regulations.

That the defendant has been and now is logging the lands

as described in the complaint; that the plaintiff has not for many years last past been engaged in logging, and that the defendant can log the material covered by the contract at a much less expense than the plaintiff. That part of the lands described in said contract are owned in common by the Omaha Railway Company and the defendant, but there is a sufficient amount of hemlock timber of the kind and character specified in the contract still standing upon the lands owned by the defendant to enable it to deliver the undelivered portion of the hemlock pulp logs specified in the contract. That from the beginning of the contract up to October 9, 1917, the plaintiff had paid to the defendant for hemlock, spruce, and balsam delivered to it under the terms of the contract $100,000 in excess of the market price at which plaintiff could have bought the same in open market. That plaintiff owes to the defendant for materials shipped during the month of September and up to October 9, 1917, $3,110.82, for which payment was not due at the time the defendant served notice of terminating the contract.

That during the year 1917 the defendant did not deliver three million feet of hemlock logs out of the seven million feet which it was required to deliver under the terms of the contract, and that these logs if delivered would have been worth the amount paid by the plaintiff, $15.50 per thousand feet, for logs purchased, which were delivered at Eau Claire at a freight rate of .124 cents per hundred pounds in excess of the freight rate from Grand View station to Eau Claire.

That during the month of October, 1909, the Superior & Southeastern Railway Company, although a common carrier, was practically doing no other business than that of a logging road of the defendant company; that all of its stock was owned by John E. Glover and members of his immediate family except one share, and that at said time the stockholders of the *Willow River Lumber Company* con-

sisted of John E. Glover and members of his family, and that George C. Glover was president of both companies; that John E. Glover was a director in both and active in the affairs and the controlling mind of both. That as a part of the same transaction which resulted in the making of the contract of October 26, 1909, a contract between the plaintiff, the Superior & Southeastern Railway Company, and the Omaha Company was made. That the plaintiff purchased the pulp wood and material specified in the contract relying upon such contract with the railway companies, and that such joint rate agreed upon was duly published and ever since has been in force. That commencing with the first shipment the Omaha Railway Company collected from the plaintiff the full joint rate of four cents per hundred pounds; that in making monthly settlements down to September, 1917, the plaintiff credited the defendant with materials shipped at the contract price and charged it with its proportion of the freight figured at one and one-half cents per hundred pounds; that such deductions for freight were accepted and allowed by the defendant without criticism or comment and no objection made until after the commencement of this action. That at the time of the making of the contract there was a local rate on pulp wood from Grand View station to Eau Claire of 3.55 per hundred pounds, and a local rate from points on the Superior & Southeastern Railway to Grand View station of $1.25 per thousand feet; that all cars were shipped direct from the loading point to Eau Claire and consigned to the plaintiff under the four-cent rate.

That at the time of making the contract of October 26, 1909, the defendant had full knowledge of the agreement theretofore made between the plaintiff, the Chicago, St. Paul, Minneapolis & Omaha Railway Company, and the Superior & Southeastern Railway Company, whereby such joint rate was established, and entered into the contract of

October 26, 1909, with a full understanding that the defendant would pay one and one-half cents per hundred pounds from the point of loading to Eau Claire. That said John E. Glover procured said contract of transportation for the purpose of inducing the plaintiff to purchase of the defendant the materials described in the contract, and that plaintiff made such purchase relying upon and because of the joint rate so established.

As conclusions of law the court found:

1. That plaintiff was entitled to a decree in the alternative requiring defendant either (1) to fulfil and carry out said contract of October 26, 1909, or, on defendant's failure to do so, (2) authorizing and empowering the plaintiff to enter upon the lands described in the contract in accordance therewith and proceed as provided therein.

2. That the decree should require the defendant to elect, within thirty days from service of the notice of entry of judgment, whether or not it will perform for the year 1919, and file a like election on the 1st day of July during each succeeding year covered by the contract.

3. That such decree should require the defendant to elect within a like period whether it will deliver to the plaintiff the three million feet of logs called for by the contract not delivered during the year 1917.

4. That such decree should also require the plaintiff to perform all the provisions of said contract on its part to be performed.

5. That judgment should be entered and the defendant by such decree be required to pay to the plaintiff, in case it shall elect not to deliver said three million feet of logs or shall fail to make such election, the sum of $10,872, with interest from January 1, 1918, to compensate the plaintiff for the difference in cost to it of the three million feet of hemlock logs purchased, together with such sum as the defendant shall owe by reason of the agreement heretofore referred to, based on the difference between the contract

price and the price of $14.75 per thousand feet, less the sum
of $3,110.82, due the defendant on account of September
and October, 1917, shipments and one car shipped in July
and inadvertently omitted in subsequent settlements. Judg-
ment was entered accordingly, from which judgment the
defendant appeals. The defendant also appeals from the
interlocutory order.

For the appellant there were briefs by *Sanborn, Lamo-*
*reux & Pray* of Ashland, attorneys, and *Horace B. Walms-*
*ley* of Milwaukee, of counsel, and a supplemental brief by
*Sanborn, Lamoreux & Pray,* attorneys, and *T. M. Holland*
of Park Falls, of counsel; and the cause was argued orally
by *Mr. Walmsley, Mr. Frank B. Lamoreux,* and *Mr. Hol-*
*land.*

For the respondent there were briefs by *Bundy & Wilcox*
and *P. M. Beach* of Eau Claire, and oral argument by *C. T.*
*Bundy.*

The following opinion was filed June 25, 1919:

ROSENBERRY, J. There are 119 assignments of error ar-
gued under twenty-three separate heads, appellant's brief
containing 300 pages. No attempt will be made to set forth
in detail all of the questions raised on this appeal; they have
all been considered, but only the more important will be
treated.

The lands described in the contract are located in Ashland
and Bayfield counties. The action was begun in Sawyer
county, but was tried in the circuit court for Eau Claire
county.

Sec. 2619, Stats., provides:

"The proper place of trial of civil actions is as follows,
respectively:
"First. Of an action within one of the classes next fol-
lowing, the county in which the subject of the action or
some part thereof is situated, viz.:
"(1) For the recovery of real property, or of an estate

or interest therein, or for the determination in any form of such estate or interest, or for an injury to real property.

"(2) . . .

"(3) For the foreclosure, redemption or other satisfaction of a mortgage of real property."

The action was begun in Sawyer county and no steps were taken to change the venue, so the action was properly triable in Sawyer county. *West v. Walker*, 77 Wis. 557, 46 N. W. 819. The question is, Can this action, properly triable in Sawyer county, be tried in Eau Claire county at a special term for Sawyer county, both counties being in the same circuit, said term being a general term for Eau Claire county, under the provisions of sec. 113.11, Stats., which provides that all business may be done at a special term which might be done at a term in the county where the business arises, except (a) the trial of issues by a jury, and (b) the trial of issues of fact in actions made local by law and arising in some county other than the one in which such special term is held?

This action was one to compel specific performance and to enjoin the defendant from interfering with plaintiff's exercising its contract rights and is therefore an equitable action and is not triable by jury. It is not an action made local by sec. 2619, Stats., as the decree in this case operates not upon the land but upon the person. The court is not asked to pass title to anything by its decree. Its judgment is that the defendant perform its contract, or, in the event of its failure to perform it, that it do not interfere with its performance by the plaintiff in the manner specified in the contract.

The defendant's next proposition is that the contract should not be specifically enforced because it contains within its provisions a remedy which the plaintiff should first exhaust before seeking the aid of equity. In view of what was said by the defendant in its letter of October 9, 1917,

which stated, "we will refuse to ship you logs on the same," referring to the contract, some question might have arisen as to how far the plaintiff should have gone in attempting to carry out the contract under the provisions authorizing it to enter upon the lands in case of the defendant's default. Upon the order to show cause why a temporary injunction should not be granted, the defendant then insisted and at all times has insisted that the plaintiff had no rights under the contract, that the contract was wholly at an end, and this action is brought for the very purpose of enabling the plaintiff to avail itself of the remedy which the contract gives it.

In its answer the defendant alleged "that the defendant had expressly revoked, canceled, and terminated the said license, authority, and permission, and . . . that when this action was commenced said license, authority, and permission was no longer operative or in force, and for that reason is not, and was not when this action was commenced, any longer subject to enforcement." Under such circumstances the plaintiff was not required to go through the useless formality of attempting to enter upon the defendant's lands.

It is next contended that the plaintiff has an adequate remedy at law and will not suffer irremediable injury if the contract is not enforced. In the statement of facts there has been set forth very briefly the facts found by the trial court upon which the conclusion is based that plaintiff's legal remedy is inadequate. There must not only be a remedy at law, but that remedy must be plain and adequate and as practicable and efficient to the ends of justice and its prompt administration as is the remedy in equity. *Miller v. Drane,* 100 Wis. 1, 75 N. W. 413. Not only is the remedy inadequate as found by the trial court, but the principles applicable to a contract for the sale of lands should apply here. Where competent parties have made a contract for the sale of lands which is reasonably certain in all its parts and not objectionable for unfairness or inequity, there is no room

for the exercise of judicial discretion as to whether it should be specifically performed or not.   Such performance is a matter of right.   *Heins v. Thompson & Flieth L. Co.* 165 Wis. 563, 163 N. W. 173.   So here there was a contract to cut and deliver certain kinds of timber from certain tracts of land to meet a specified purpose.   It is clearly shown that no other like opportunity is open to the plaintiff. Such a contract cannot now be made.   The defendant had the benefit through seven years of the full performance of the contract and is certainly in no position to complain or to shield itself behind the claim that the plaintiff has an adequate remedy at law.   Not only are the damages practically impossible of ascertainment with any fair degree of accuracy, but the amount of material to be delivered can be determined only by the completion of the contract.   To require plaintiff to shut down its plant or to run it with an inadequate supply of raw materials, lose the benefit of its power lease and of its plant investment for an indefinite period, under the circumstances found by the trial court, would be manifestly inequitable and unjust.   It would be manifestly impossible for the plaintiff, in view of the unknown and changing costs of labor, supplies, and transportation, to prove its damage over the remaining period of the contract.   Under the facts found by the trial court it is doubtful whether or not the plaintiff could secure in the later years of the contract period materials at a price which would permit it to use its plant.   The evidence is ample to sustain the findings of the trial court, and the conclusion necessarily follows that the plaintiff's legal remedies are inadequate.

The defendant further claims that the contract is too indefinite and uncertain to be capable of specific performance, both in its provisions relating to the defendant doing the work and in its provisions relating to plaintiff doing the work under the entry clause. ·

Most of the uncertainties complained of, if such there

be, arise by reason of the defendant's wilful breach of the contract. Under the contract the defendant may at its option deliver certain hemlock and tamarack pulp wood. The first party (defendant) also agrees to peel the hemlock logs, and in the event of its failure to peel said logs the second party (plaintiff) shall have the right to peel the logs and retain the bark. The contract contained certain other options as to substitution of lands and as to other matters. It is thought that because of these options which the defendant had under its contract the contract is incapable of specific performance because the plaintiff in the event of its entry under the entry clause could not exercise these options. These and other uncertainties are imaginary and fanciful. If the defendant in defiance of the decree of the court continues in its refusal to perform the contract and to comply with the court's decree, such refusal must amount to a waiver of its options under the contract. With these options eliminated all uncertainties disappear, and the plaintiff will be authorized to enter upon the lands in accordance with the terms of the entry clause and cut and remove therefrom the material therein specified. The case of *Park v. M., St. P. & S. S. M. R. Co.* 114 Wis. 347, 89 N. W. 532, has no application to the facts found by the trial court in this case. The contract in this case is definite: the timber and pulp wood are to be cut from certain lands, delivered at a particular place and in a certain way. No peculiar skill or ability is required to cut and log hemlock timber, and there is no reason why it may not as well be done by one person as by another. That it may be done much more advantageously by the defendant, which is fully equipped and organized for such work, is, as the trial court finds, clearly apparent. If, however, the defendant continues to violate the terms of its contract and to defy the decree of the court, the increased cost of operation will fall upon it under the terms of the contract. The contract was performed for seven years in

a spirit of mutual helpfulness and accommodation and a practical construction has thereby been placed upon the contract which in case of controversy ought to furnish a reliable guide to future action.    The contract by its terms provides for all reasonable contingencies.    It being one enforceable by a court of equity, the defendant has no power to terminate it, much less the right to do so.    Whatever loss or injury the defendant sustains will be the result of its own wrongdoing.

It is claimed that the entry clause contained in the contract is a mere license to enter upon and cut, and was therefore revocable and was in fact revoked before the commencement of this action.    Without entering into a discussion as to the exact nature of the plaintiff's rights under the entry clause, it is sufficient to say that in this case, under the facts found, the plaintiff's rights were more than those of a licensee under a revocable license.    Here, the plaintiff had for seven years performed the contract in reliance upon this provision; it was a part of the consideration for the contract, a valuable part.    Plaintiff has expended $100,000 in excess of the market price of the material which it has received in reliance upon the contract, ( which the right of entry was a material and substantial part.    To deny the plaintiff the right to enter upon the lands of the defendant and take therefrom that which it has purchased, would, as found by the trial court, inflict an irreparable loss upon the defendant and would amount to a fraud.    The privilege here given was incident to a valid grant, is evidenced by a written instrument, is supported by a valid consideration, has been acted upon by the plaintiff, and is therefore not revocable.

It is argued that specific performance should be denied upon the facts found by the trial court, for the reason that specific performance of the contract would be detrimental to the public interest in that it would tend to foster a mo-

nopoly.   No facts appear upon the record and none are called to our attention upon which such a claim can be based. The validity of the contract must be determined as of the time it was made and not as of the time when specific performance is sought.   However, it is not intended to intimate that, if the facts as they now exist had existed at the time of the inception of the contract, anything appears upon which a finding could be based that specific performance of the contract would be in any way detrimental to the public interest.

Upon the whole case the plaintiff is clearly entitled to the decree of specific performance of the contract.   The contract is definite and certain, the legal remedies of plaintiff are inadequate, and valuable rights under the contract can be preserved to it in no other way.   The defendant entered into a fair contract and for many years it proved to be a very profitable one.   Because the market price of the material covered by the contract has advanced, defendant seeks to be relieved of its solemn obligation formally entered into. If the contract were not one capable of specific performance the defendant would have the power to terminate it, but being capable of specific performance it must perform the contract or submit to the legal consequences.   Specific performance of the contract was properly decreed by the trial court.   *Heins v. Thompson & Flieth L. Co.* 165 Wis. 563, 572, 163 N. W. 173; *Kipp v. Laun,* 146 Wis. 591, 131 N. W. 418; *Curtis L. & L. Co. v. Interior L. Co.* 137 Wis. 341, 118 N. W. 853; *Daniels v. Bailey,* 43 Wis. 566, 569; Pomeroy, Contracts (2d ed.) sec. 6; Waterman, Spec. Perf. § 15; *St. Regis P. Co. v. Santa Clara L. Co.* 173 N. Y. 149, 65 N. E. 167; *S. C.* 186 N. Y. 89, 78 N. E. 701.

The court having taken jurisdiction for the determination of the equitable issues involved, also determined and awarded damages which had been sustained to the time of judgment.   This was correct and clearly within its power.

*Combs v. Scott,* 76 Wis. 662, 672, 45 N. W. 532; *McLennan v. Church,* 163 Wis. 411, 158 N. W. 73.

The contract of October 26, 1909, contained the following provision:

"Said first party [defendant] does hereby agree to sell to the party of the second part [plaintiff] the timber, logs and pulp wood hereinafter described, cut said timber into logs and pulp wood, load said logs and pulp wood on the cars, and deliver the same to party of the second part at Grand View on the Ashland division of the Chicago, St. Paul, Minneapolis & Omaha Railway."

The logs were hauled to Grand View by the Superior & Southeastern Railway Company. At the time the contract was entered into there was a local rate on the Superior & Southeastern Railway, from the point where the logs were loaded, to Grand View, of $1.25 per thousand feet. Contemporaneously with the making of the contract of October 26, 1909, the plaintiff, the Superior & Southeastern Railway Company, and the Omaha Company entered into a contract for a joint rate by which the logs were to be transported from the loading point to Eau Claire and delivered to the plaintiff for four cents per hundredweight, which was to be apportioned between the Superior & Southeastern Railway Company and the Omaha Railway Company, the Omaha Railway Company receiving two and one-half cents and the Superior and Southeastern Railway Company one and one-half cents per hundredweight. During the seven years that the contract was performed the Omaha Railway Company collected from the plaintiff freight at the rate of four cents per hundredweight. One and one-half cents per hundredweight was charged to defendant and deducted from time to time from the amounts owing by the plaintiff to the defendant, the defendant under the contract being required to pay the freight on the logs to Grand View, the junction point of the Omaha Railway Company. The trial court

found that the Superior & Southeastern Railway Company was practically only a logging road of the defendant company; that the owners of the Superior & Southeastern Railway Company were John E. Glover and members of his immediate family; that the owners of the defendant company were John E. Glover and members of his immediate family; that the contract of October 26, 1909, and the contract between the plaintiff, the Omaha Railway Company, and the Superior & Southeastern Railway Company were parts of the same transaction; and it clearly appears that one contract was a consideration for the other. The court further found that the contract fixing the freight rate was made between the plaintiff and the railway company for the purpose of inducing the plaintiff to purchase of the defendant the material described in the contract and that plaintiff made the purchase relying upon the joint rate so established. While the rate contract was not signed until November 27, 1909, it was fully agreed upon prior to the signing of the contract of October 26, 1909.

Defendant contends that it ought to be required to pay no more than $1.25 per thousand feet, the local rate to Grand View. It appears that the rate of one and one-half cents per hundredweight amounts to $2.085 per thousand feet. The contention of the defendant is that the publication of the contract rate had no effect upon the local rate and that it should be charged no more than the local rate. The local rate from Grand View to Eau Claire on the Omaha Railway is 3.55 per hundredweight. If the plaintiff were required to pay the sum of the two locals it would have been compelled to pay a sum in excess of four cents per hundredweight. While the contract of October 26, 1909, does not specify the rate which the defendant was required to pay for delivery of the logs at Grand View, the conclusion of the trial court that the agreement to deliver the logs at Grand View amounted to an agreement to pay the freight as speci-

fied in the contract between the plaintiff and the railway companies, the defendant company having full knowledge of all the facts and circumstances, is one abundantly supported by the evidence. The contracts were not only made contemporaneously, one being a consideration for the other, one being made in reliance upon the other, but the defendant company made settlement for seven years without objection on this basis, which is conclusive as to the basis upon which the freight rate was to be apportioned. The defendant company has therefore been properly charged with one and one-half cents per hundredweight, and on subsequent shipments should be charged a like sum. If the defendant has thus indirectly paid the Superior & Southeastern Railway Company a greater sum than it is legally entitled to receive, and upon that we express no opinion, its remedy is against that company and not against the plaintiff, which is obliged to pay the contract rate to the Omaha Railway Company in order to get possession of its property.

It follows from what has been said that the order granting a preliminary injunction was right and should be affirmed.

*By the Court.*—Judgment and order appealed from affirmed.

ESCHWEILER, J., dissents.

The appellant moved for a rehearing, and the following opinion was filed November 4, 1919:

PER CURIAM. Appellant's motions for rehearing are denied without costs, except clerk's fees on both motions.

It is conceded upon the motion for rehearing in the main case that an error amounting to $951.28 was made in computing the amount of the judgment. This renders a modification of the mandate necessary. It is therefore ordered that the mandate be modified to read as follows:

"The order appealed from is affirmed. That part of the

judgment requiring the defendant tó pay to the plaintiff the sum of $4,164.48, as therein specified, is modified so as to read $3,213.20, and as so modified the judgment is affirmed."