### GRAY v. PREMIER INV. CO.
### Civ. No. 874.

District Court, W. D. Louisiana,
Shreveport Division.

Sept. 25, 1943.

Elias Goldstein, of Shreveport, La., for plaintiff.

Chas. L. Mayer, of Shreveport, La., and E. J. Lundy, of Tulsa, Okl., for defendant.

DAWKINS, District Judge.

Plaintiff's original petition, alleged upon a contract consisting of a proposal contained in a letter, which was accepted in writing, providing for the delivery of certain quantities of oil per month during the term, which it appeared conceded, will not expire until 1945. The bill charges that defendant was about to sell or transfer the leases upon lands from which the oil was to be produced and delivered, without making proper provision to carry out the terms of this contract. The prayer was for a restraining order, and upon hearing for a preliminary injunction, followed finally by a permanent writ.

The restraining order was granted and the application for temporary injunction

was heard on September 7, 1943. At that time defendant first moved to dismiss the complaint upon the ground that it did not state facts showing plaintiff entitled to relief in a court of equity, and further, that the facts alleged were based upon information and belief. It also filed an answer, as the court directed that all matters be submitted at one time, both on the motion to dismiss and the merits of the application for preliminary injunction, upon affidavits, some of which were permitted to be filed within one week; and the restraining order was extended for a period of ten days. All rights under the motion to dismiss for want of equity were reserved, to be disposed of without prejudice. Defendant also filed a motion to increase the bond for the restraining order, which at another hearing a week later, was sustained and the bond increased from $1,000 to $5,000. The briefs were not filed until about the time the first extension would have expired and another extension of ten days was entered.

The answer admits the contract, but avers that "it is, and was, the intention of Premier Investment Company not to make a sale or sub-lease of the property without a provision that the purchaser or sub-lessee of the defendant would complete for the account of defendant any valid, executory contract of the defendant for the sale of oil from the properties." It denied the prospective injuries alleged by plaintiff.

Taking up the motion to dismiss, the allegations of the original petition, upon which the plaintiff relies as showing it is entitled to equitable relief, or that it has no adequate remedy at law, are in substance as follows: that his plant is engaged and equipped for refining oil of the type and gravity produced from the particular leases in the Bellevue Field, where his plant was purposely built for the use of such oil; that the demand is such that it is not possible to obtain his requirements for this particular kind of oil from any other producing available field; and unless defendant is restrained from violating its contract plaintiff's business will be destroyed; that for the breach of the contract from month to month during the remainder of its unexpired term, plaintiff would be compelled to institute a multiplicity of suits, and that the damages would be next to impossible to estimate and determine. The final prayer was for a permanent injunction restraining defendant "from selling to the Bayou State Oil Company or to any other * * * the leases owned by it * * * without stipulating in the act of conveyance or assignment that the vendee or assignee shall fully comply with all obligations" of the defendant to plaintiff. In the amendment filed on September 7th, plaintiff alleged that he had been informed that the defendant would hold a meeting of its stockholders and directors on September 1, 1943, to authorize the sale of its leases to the Bayou State Oil Company without "provision for the observation by the seller (purchaser) of the obligations of the defendant to plaintiff" and that petitioner had endeavored without success to induce both the proposed seller and purchaser to give assurance that the said sale would be made "subject to the rights of complainant to receive the oil produced" according to his contract; and further that serious differences between the stockholders of defendant would probably prevent a liquidation of the Premier before July 15, 1945, date of expiration of the contract and of which plaintiff might or might not acquire information in time to intervene therein and assert his claim against the corporation.

Upon the proofs, it appears that the existence of the contract between the parties, substantially in the terms as alleged by plaintiff, is admitted, as is the proposed sale or subleasing by defendant of its interest in the properties covered by the bill of complaint, for the sum of $80,000 cash and $120,000 out of a portion of the 7/8 working interest in the leases. It also appears that the proposed purchaser, Bayou State Oil Company, had accepted the terms and would have executed the agreement but for the restraining order issued herein on August 30, 1943. The proposal also covered all the equipment on the leases used in connection therewith, except certain quantities of pipe, etc., which apparently were not needed. This, of course, made it impossible for defendant to continue operations.

Plaintiff submitted both his affidavit to the complaint and an additional one made and filed September 7th. In the latter it was stated that his plant is capable of refining 18,000 barrels per month, and that during recent months he had refined from 12,000 to 14,000 barrels per month; but that in order to operate without a loss, it is necessary that he refine at least 12,000 barrels per month; that during 1942, his said plant "earned more than $70,000 before depreciation and more than $50,000 after

depreciation"; that it is impossible to estimate the amount of damage it would suffer by the "cutting off any considerable portion of his supply of crude oil"; or the profits he would make because of the "unpredictable and varying conditions under which he and all other persons engaged in business today must operate"; that he purchased a large part of his crude oil from the defendant whose production is close by his refinery, and the cost of transportation small; that he had been purchasing from defendant 5,372,000 barrels of oil per month during 1943; that he had been repeatedly advised by the vice president of the defendant that it had "no commitments to others for the sale of oil" produced from these wells "with the exception of Bayou State Corporation", which had expired on February 1, 1943; and that plaintiff became entitled thereafter under terms of his contract, to purchase all the oil produced from said leases, but that he, plaintiff, had agreed with one Wickett, vice president of defendant, that the latter might furnish to Bayou State 3,000 barrels per month "for a few months until it could make arrangements to get other oil". Affiant attached copies of correspondence between himself and officers of the defendant covering these points. Further, that some of the officers of defendant were contending that they had the right to renew the agreement with Bayou State so that it would receive 7,000 barrels of their production per month; that on August 23d, affiant addressed to the officers of defendant a letter demanding that, effective September 1st, he should receive all the oil produced from said leases, copy of which was attached to the affidavit; and that on the same date a letter was addressed to the Bayou State, advising it that plaintiff had learned said company intended to purchase these properties from defendant and requesting that the Bayou State "advise him that it would carry out the obligations" of the defendant "if it bought the properties" (copy of this letter is attached to the affidavit), but that no reply was ever received from either the defendant or the Bayou State, except that the president of defendant telephoned affiant on August 26, 1943 "and asked if he (plaintiff) would be in position to make Premier an offer on its Bellevue properties at or before September 1st", as it had an offer from Bayou State, which was subsequently authorized by the stockholders and directors of defendant, but affiant informed the said president that he was not interested in making such an offer. Further, that since September 1st, plaintiff had received no oil from defendant, but had been told frequently of violent differences between the stockholders of defendant and that the latter was going to be liquidated; further, that plaintiff has conducted a successful business and now there is a demand for his product, to meet which would require all the oil that defendant can produce from the said leases; that if he does not receive said oil, his plant will be forced to shut down with consequent great loss and damage, which it would be impossible to determine; that the reason he is so dependent upon said production is that he can not obtain replacement in any section that it would be profitable to operate, stating details of fields and conditions where similar oil is produced; and finally that his said plant is designed to refine the type of oil which is produced by defendant in the Bellevue Field, and that under present conditions, due to the war, he can not obtain materials to convert his plant so as to use other types of crude oil. Affiant attached several exhibits, consisting of letters from officers of defendant, etc.

Plaintiff also offered the affidavits of others as follows: (1) an accountant who had audited his books during the past years, giving figures showing the results of actual operations of his plant in recent months, and supporting in large measure his own affidavit with respect thereto, including the statement that it would not be profitable to operate, if plaintiff were deprived of as much as 4,000 to 5,000 barrels of the oil which it now purchases; and (2) affidavit of I. G. Abney, engaged in producing and marketing oil since 1938 of the type used by plaintiff, to the effect that "it would not be possible" for plaintiff "to purchase oil of this quality and type from producers operating in the Caddo Parish Field" and that none of it is available in the Bellevue and Smackover Fields.

For defendant affidavits were offered as follows: by K. L. Wickett, vice president of defendant, that on September 1st, the stockholders and directors of defendant authorized execution of a sale or sublease of the properties of defendant involved in this case to the Bayou State Oil Company, and that while the said contract was being written, telegraphic advice of the filing of the present suit had been received, and although it was believed execution of the

contract would not violate terms of the restraining order, out of respect therefor and because of its uncertainty and vagueness, further negotiations were stopped; and that the Bayou State Oil Company was ready and willing to complete the said transfer, which would have been done but for the said restraining order. Copy of the proposed sale or transfer was attached and discloses that notice was taken specifically of obligations to certain persons other than plaintiff as to the sale of oil and that the transfer was to be "subject to the rights of the parties in those two contracts". It also recites that "cognizance" is taken of the contract of December 10, 1940 (which plaintiff claims had expired), "the last renewal of which is dated August 21, 1943, and covers the sale of * * * not less than five thousand barrels (5000) and not more than seven thousand (7000) barrels per month". The parties "expressly recognize the validity of the said last renewal and agree that the same is not merged in this contract and is not abrogated thereby except so far as the said contract may be inconsistent with the provisions of this instrument." Section 9 of the said proposed contract is as follows: "After Bayou shall have taken over the operation of the properties in accordance with the terms hereof, it will complete for the account of Premier any valid executory contract of the Premier for the sale of oil or other minerals from the properties and will collect the purchase price therefor, accounting to Premier in accordance with the terms hereof. For all oil used by Bayou in its operation it shall charge itself with the purchase price thereof as is stipulated in the contract between Premier and Bayou, referred to in Paragraph Eight of this instrument. One-half of seven-eighths of the total proceeds of all oil, gas or other minerals produced and sold from the leases described in this instrument shall be credited to Premier for application upon the purchase price until the Premier shall have been paid the total sum of one hundred twenty thousand dollars ($120,000.00), and one-fourth of seven-eighths of the total proceeds shall thereafter be credited to Premier until it shall have been paid an additional sum of forty thousand dollars ($40,000.00), all as provided previously herein."

The proposal otherwise would obligate the purchaser to pay the purchase price at the rate of $3,750 per month and to make up the deficiency, if any, within sixty days after notice, which, of course, determines the period within which the contract was to be completed, before the Bayou State could acquire full ownership of the interests conveyed. It also would obligate defendant to sell to Bayou State "all oil which may accrue to it (Premier) from the Nacatosh sand."

As appears from section 9 of the above agreement, above quoted, the Bayou State was to "complete for the account of Premier any valid executory contract of the Premier for the sale of oil or other materials from the properties", but it does not name specifically that of the plaintiff as it does those of the other parties referred to.

On September 13th, following the hearing of the 7th, plaintiff filed a second petition, in which it was alleged that since the filing of the suit it had learned that Premier had, during the month of August, delivered the Bayou State 5,000 barrels of oil instead of the 3,000, which plaintiff had consented might be furnished, and that the proposed contract between these parties would require delivery to Bayou State of "the greater portion of the oil purchased from the Nacatosh sand on its Bellevue leases." The amendment otherwise recites the terms of the proposal, which the plaintiff claims would make impossible performance of his contract. Other allegations are made to the effect that plaintiff had, on December 29, 1942, signed an option to purchase a one-half interest in the leases from defendant, depositing the sum of $5,000, which he had forfeited, as he had a right to do under the terms thereof, and which "estops defendant from contending it had at that time any commitment to the Bayou State Oil Company." Copy of the option is attached to the affidavit of plaintiff. The prayer of the original bill was repeated and, in addition, plaintiff prayed that defendant "be required to comply with its obligation to deliver all the oil produced from the Nacatosh sand on its Bellevue leases to complainant pleading a final determination of this case"; and finally for a judgment for specific performance of the contract sued upon. Other documents attached to the affidavit of Gray, filed on September 13th, consisted of a series of correspondence between him and defendant, with respect to the option of plaintiff to buy one-half interest in the property, copy of the original contract between defendant

and Bayou State, dated December 10, 1940, and the amendment thereof, dated May 20, 1941.

On the same date, September 13, 1943, defendant filed a rebuttal affidavit by E. A. Jacobson, superintendent of defendant in the Bellevue Field, to the effect that the interest of Premier covered about 2,000 acres from which oil is being produced from sixty-nine wells but that there was no "flush" production, the oil being produced "by means of pump-jacks"; that about 95 per cent of the fluid pumped is water, which has to be taken out before the oil can be delivered to the purchaser and that this is done with power derived from natural gas produced from wells on the same property.

It thus appears that there is little or no dispute as to the facts, as to the relations between the parties and the effects which would flow from a sale of the properties by defendant.

Of course, the primary question is as to whether, in the circumstances thus revealed, if the defendant breaches its contract by refusing or failing to deliver the oil as agreed, the plaintiff would have an adequate remedy at law. Ordinarily, he could protect himself by purchasing similar oil in the open market one charging the defendant with the difference between the price paid and what would be due under the contract. However, in this case, it is shown by plaintiff, and nothing is offered to the contrary by defendant, that the former's plant was constructed to handle the particular type of oil which Premier produces from its leases in the Nacatosh sand of the Bellevue Field; that at this time, and for an indefinite period, plaintiff can not obtain its requirements, sufficient to permit proper operation of the plant, from any other sources; that it is not possible to convert the plant to refine other types of oil because of restrictions imposed as the result of the present war, and the inability to obtain materials for that purpose; and that it would be necessary to close down with the result that a profitable business will be destroyed. It is further disclosed that it would be next to impossible to ascertain the extent of plaintiff's losses or damages, as it might, if oil of the type required was available for profitable operation from other sources. It is also apparent that the proposed purchaser of these leases, Bayou State Oil Company, will contend that it has the right to a renewal of the contract of December 10, 1940, by which it should receive a considerable portion of the production, to the extent that would make it impossible to perform the contract with plaintiff, and that in the agreement which was about to be entered into when the restraining order was issued, the parties were attempting to recognize and confirm in writing that contention; whereas, the plaintiff contends that the earlier contract had expired and that he was entitled to all the production from the Nacatosh sand. This would, in all likelihood, bring about extended litigation between the plaintiff, defendant, and the Bayou State Oil Company, which would be in addition to the actions at law, which he probably would be compelled to institute for the breach of the contract, basis of the present suit. It is clear that, under the provisions of the proposed sale or sublease to the Bayou State, defendant would make it impossible to itself comply with the terms of its contract; and it also seems clear that the obligations imposed upon the proposed purchase, including the provisions for and sources from which the purchase price was to be paid, could and would leave little or no oil available to meet the requirements of plaintiff's contract with the defendant.

From all of this it follows that an action at law would not afford relief which a court of equity is able to give. See Hendler Creamery Co. v. Lillich, 152 Md. 190, 136 A. 631, 60 A.L.R. 207; Cyclopedia of Fed. Proc., Sections 3541, 3543, 3545, 3546; Southwest Pipe Line Co. v. Empire Natural Gas Co., 10 Cir., 33 F.2d 248, 64 A.L.R. 1229; Hawaiian Pineapple Co. v. Saito, 9 Cir., 270 F. 749; Diamond Alkali Co. v. P. C. Tomson & Co., Inc., 3 Cir., 35 F.2d 117.

In the case of Southwest Pipe Line Co. v. Empire Natural Gas Co., supra, a situation somewhat similar to the present one was involved, in that, the Empire had "a contract which entitled it to all the gas produced from certain leases"; that it had connected its pipeline therewith but that the Southwest, assignee of the other party to the contract, had disconnected pipes of Empire and was proceeding to dispose of the gas otherwise. The lower court had dismissed the case for want of equity, but the Court of Appeals for the Eighth Circuit reversed that ruling, and in passing upon the crucial question of adequacy of a remedy at law, affirmed the jurisdiction in equity to enjoin the breach of the contract, and at page 258 of 33 F.2d said:

"Appellant contends that, even if it had notice of appellee's rights, specific performance of the contract should not be granted, because it is shown by the evidence that appellee could obtain an available supply of gas from other sources. There was evidence that in the gas field in and around Bristow one Wilson had brought in a well that gauged some 37,600,000 feet per day, and that he offered to sell the gas to the Empire Company at the same price as was being paid under the contract in question, but that the company refused to accept the offer. In Texas Co. v. Central Fuel Oil Co. [8 Cir.], 194 F. 1, 13, it was contended that specific performance was not the proper remedy to enforce a contract affecting personal property, and that a court of equity is without jurisdiction when an action for damages is adequate. The court said: 'It is now well settled that, when the chattels are such that they are not obtainable in the market, or can only be obtained at great expense and inconvenience, and the failure to obtain them causes a loss which could not be adequately compensated in an action at law, a court of equity will decree specific performance.' In Hall v. Philadelphia Co., 72 W.Va. 573, 78 S.E. 755, the court said: 'Contracts of sale of mere commodities procurable in the markets are never subjects of specific performance for obvious reasons, but this contract is not within that class. Natural gas is not obtainable in the general markets as is wheat, corn, flour and live stock.' See, also, Pomeroy's Specific Performance of Contracts (3d Ed.) p. 41, § 15.

"Here it is without dispute that, relying in part upon its contract with the Revelle Company, appellee built a pipe line at an expense of $125,000, and a compressor station at an expense of $30,000. The testimony shows that the production from the leasehold in question is about 25 per cent. of the production of the field available to appellee's pipe line. Therefore, by appellant's acts, if successful, appellee would be deprived of one-fourth of the gas which it needs to carry on its established business. In order to secure gas from the adjacent field, it would be necessary to lay other pipe lines and to make new connections. The building of new pipe lines and the installing of now meters is a matter of large expense. It is not the same situation as securing coal or other commodities to take the place of those which may not be supplied under a contract. The whole situation as to natural gas is uncertain, and the obtaining of the gas from other sources could be only at great expense and inconvenience. The contract tendered by the Wilson interests provided for the taking of a minimum supply of gas, which appellee was not willing to do. Under these circumstances, we do not agree with the position taken by counsel for appellant in his most able argument that the remedy must be at law for a breach of contract. We think there is no question that this action is maintainable under the general principles of equity on account of the inadequacy of any legal remedy to afford appellee proper relief. The adequate remedy at law must be as practical, speedy, plain, and complete as the remedy in equity. The damages to be recovered by appellee would seem to be speculative and impossible of proof, for it could not be ascertained what the flow of the wells would be or what decrease would come about in the natural order of events. The action of appellant was a trespass upon appellee's rights, assuming that those rights were known to it. Equity could enjoin such interference, and, if the same worked specific performance of a contract to which appellant was not a party, that would be relief incidental to the protection of the rights granted by the contract. On the general subject see White Marble Lime Co. v. Consolidated Lumber Co., 205 Mich. 634, 172 N.W. 603; Dells Paper & Pulp Co. v. Willow River Lumber Co., 170 Wis. 19, 173 N.W. 317; American Refining Co. v. Tidal Western Oil Corporation, Tex.Civ.App., 264 S.W. 335; Pioneer Sand & Gravel Co. v. Seattle Const. & D. D. Co., 102 Wash. 608, 173 P. 508; 16 Cyc. p. 41."

In the present case there is no question of notice to an assignee or third party under the contract. The plaintiff has brought his action timely, while the leases are still held by the defendant, and, it is conclusively shown that, but for the restraining order, the transfer would have been made with the consequences stated above. The object here is to prevent the breach by staying the sale, except on condition that plaintiff's rights are recognized and assumed by the transferee. This, of course, is an indirect way of obtaining specific performance but the result is no different to that flowing in the cited case. Defendant asserts that this court would have to supervise the performance of the contract, for the period of some two years which it has yet to run, but that does not

necessarily follow, for if defendant can not dispose of its oil otherwise, it would be faced with the choice of complying with this contract, which it should in good conscience do, or of not being able to dispose of its oil. In the latter event, it would be confronted with withdrawals of others from the sand in this field, and at the same time, would subject itself to such damages as plaintiff might be able to prove for the breach or refusal to comply. It is true that in Southwest Pipe Line Co. v. Empire Natural Gas Co., supra, the appellee's pipe lines were connected with the wells of appellant and the former could continue to withdraw the gas with its natural pressure and by use of pumping stations, which appellee had installed. However, this difference in the physical situation is not such as to affect the principle of law involved here. Plaintiff's contract calls for certain fixed quantities of oil from the defendant's tanks, which are evidently connected by a pipe line with plaintiff's plant, and also for all the rest of the oil from defendant's Bellevue leases, not otherwise committed; and in a trial on the merits, the question of the extent of the Bayou State's rights in this additional oil under the contract of December 10, 1940, can be determined, if necessary, by making it a party hereto.

■ In a supplemental brief counsel for defendant raises the point that price ceilings fixed by the Government on crude oil, during the present war, make it impossible to perform the contract in this case. The prices to be paid from time to time under the terms of the agreement were stipulated as the "average of the prices posted by the Gulf Refining Co., Standard Oil Co. of Louisiana and the Texas Co." So far the pleadings make no such issue, and while the defendant may be permitted to amend its answer before trial on the merits, there is nothing before this court in the way of proof as to what the actual situation with respect to the marketing of oil is at this time, and the only thing of which it may take notice is that a ceiling has been fixed; whether higher or lower than would otherwise be the market price does not appear. For this reason the question will not be considered at this time.

Defendant has cited among other authorities the case of Javierre v. Central Allagracia, 217 U.S. 502, 30 S.Ct. 598, 600, 54 L.Ed. 859, to the point that a court of equity will not grant an injunction against breach to enforce the terms of a contract, which would require it to supervise performance of a multitude of acts over a long period of time. In that case, the undertaking was the future delivery to a sugar mill of crops of cane to be ground over a period of several years. Justice Holmes wrote the opinion, and while stating that he would "have preferred to affirm the decree" (granting the injunction), since a majority thought the judgment of the lower court was wrong, it would be reversed. The opinion is short and there is nothing to show whether the refinery could have purchased cane from other sources and have charged the growers with the difference, if any; or that, as in the present case, the refinery would have had to close down. It is simply stated, that, according to the opinion of the majority of the judges, "a suit for damages would have given adequate relief, and therefore the appellee should have been confined to its remedy at law." Here, as previously stated, the proof, so far, makes clear the inability of the plaintiff to operate, as well as the difficulty and uncertainty of proving his damages.

Cappetta v. Atlantic Refining Co., 2 Cir., 74 F.2d 53, also cited, would seem to be distinguished by simply quoting the second syllabus as follows: "Where five-year contract, requiring defendant refiner to furnish gasoline to plaintiff, its authorized dealer, had been performed more than year before defendant sought to terminate it after plaintiff had begun to cut prices, plaintiff's remedy at law for breach held plain, complete, and adequate, precluding injunction requiring specific performance, though contract term was rendered somewhat indefinite by provision authorizing defendant to cancel it if plaintiff's mother canceled her outstanding garage lease to defendant. Judicial Code Sec. 267 (28 U.S.C.A. § 384)."

Here again there is nothing in the decision to disclose that appellant could not have obtained gasoline elsewhere, and besides, as pointed out in the syllabus, the terms of the contract were involved in doubt, which made them difficult to apply.

In Hutchinson Gas & Fuel Co. v. Wichita Natural Gas Co., 8 Cir., 267 F. 35, while the language quoted and relied on by counsel tends to support defendant's contention, a reading of the case reveals that the refusal to affirm the lower court's decree for an injunction to prevent breach was based primarily upon the fact that it was found that the original contract had been so modi--

fied as to rob it of mutuality and that the complainant company, under the modification, was not bound to take the gas of the appellees. Of course, no contract which is unilateral can be enforced as to either party.

In Sewerage and Water Board v. Howard, Receiver, 5 Cir., 175 F. 555, the appellant, a public body created by act of the Legislature, for providing water and sewerage in the city of New Orleans, had made a contract with the appellee, as Receiver of New Orleans Waterworks Company, by which the former was to gradually take over the furnishing of water to consumers from the latter and it was the contention that the Board to which the distribution system had been delivered, should continue to deliver water to mains still operated by the water company, so long as any of its customers, including those which had not been connected therewith when the contract was made, desired to have water and until the Board had made its own connections with the several thousand premises of consumers. The specific relief sought was an injunction to prevent carrying out the resolution by the Board limiting the furnishing of water to the Water Company in various areas for periods of 30, 60 and 90 days. The Court stated, that while the uncertainties of the situation were such that the court would be required to retain "the bill and supervision of the contract indefinitely", it found further that complainant had alleged it would be "damaged in a definite sum by the anticipated violation of the contract, and it does not allege the insolvency of the respondent or suggest any reason why damages should not be collected. It is evident in this case that the court can not make a decree ending the controversy, and if performance be decreed, the case must remain in court for a long and indefinite time". Here again, there was not a situation where the complainant either alleged or had shown that it did not have an adequate remedy at law. The facts alleged were such as to concern more consumers of the water than complainant, and as stated by Judge Foster, the latter had alleged the specific sum in which it would be damaged, so that, if it was correct in the charge that the Board was violating its contract, a jury could fix the damages. The contract, which is quoted in the opinion, indicated that the Board would gradually make its own connection with the premises of thousands of consumers, which would require a long period of time, and the court would not keep the case under its jurisdiction to supervise this change over from private to public operation of the water and sewerage system for a large city. In the present case there is to be no change in the method of operations but plaintiff merely seeks to have the defendant continue to carry out its contract in the manner in which it has done for some three years, instead of delivering its oil to other purchasers.

 The many other cases cited can be differentiated from the present one in some of their aspects. Each must stand upon its own facts, and while it is true that, ordinarily, specific performance will not be decreed or injunction issued to prevent a breach for the sale or delivery of personal property, where the situation is such that an action at law would not and could not give adequate relief, but on the contrary, would allow an unconscionable breach on the part of the other party, a court of equity is justified in exercising its powers to prevent that result.

All uncertainty as to whether defendant had intended to dispose of the property has been removed by its admissions and exhibits, filed with its pleadings; hence, there is no need to discuss the authorities cited with respect to the allegations made on information and belief.

Proper decree should be presented.