BALDWIN and another, Appellants, v. ANDERSON and another, Respondents.

*No. 129. Argued September 3, 1968.—Decided October 1, 1968.*
(Also reported in 161 N. W. 2d 553.)

34

40

For the appellants there were briefs by *Geffs, Geffs, Block & Geffs* of Janesville, and oral argument by *Jacob Geffs*.

For the respondents there was a brief by *Wickhem, Consigny & Sedor* of Janesville, and oral argument by *Robert H. Consigny*.

HEFFERNAN, J.

*Was the trial court's finding that the parties intended the purchase and sale of all the Baldwin-Patterman farm, even though a portion of that farm lay south of the river, contrary to the great weight and clear preponderance of the evidence*

The sellers argue that the trial court's finding that it was the intention to sell the entire farm including what might lie on the south side of the present river course should be set aside. They point to the offer to purchase, which recites, "the part North of Sugar River." Even though admitting that the acreage was 31 acres less than stated in the offer to purchase, they point out that the

413 acres was "more or less." They also argue that the purchasers had an opportunity to inspect the farm and that, in response to a specific inquiry, one of the sellers pointed out to one of the buyers that the southern boundary of the farm was the Sugar River (this apparently is now acknowledged by the sellers to be an inaccurate statement).

Perhaps a contrary finding could have been made, but this court has frequently stated that the test of a trial court's finding is not whether another finding could have been upheld but whether the finding that was made can be upheld as being not contrary to the great weight and clear preponderance of the evidence. *Clark v. Moru* (1963), 19 Wis. 2d 503, 504, 120 N. W. 2d 888; *Druml Co. v. Capitol Machinery Sales & Service Co.* (1965), 29 Wis. 2d 95, 98, 138 N. W. 2d 144; *Ochiltree v. Kaiser* (1963), 20 Wis. 2d 191, 196, 121 N. W. 2d 890. In making its findings, the trial court took into consideration all of the instruments involved in the transaction as well as the conduct of all of the parties. We pointed out in *H. & R. Truck Leasing Corp. v. Allen* (1965), 26 Wis. 2d 158, 163, 131 N. W. 2d 912, that, "In determining the parties' intent, it is appropriate to consider factors happening before and after the signing of an agreement."

The trial court properly took into account not only the words of the offer to purchase, but also the words of the proposed land contract which reflected the vendors' interpretation of the vendees' offer to purchase. The trial judge reasonably interpreted the land contract to mean that the vendors wished to convey all of the farm. He found:

"That the parties intended to convey all of the premises known as the Baldwin and Patterman Farm, whether north or south of the Sugar River, in accordance with the customary abstract description, wherever the actual boundaries extended as disclosed by the accepted legal

description, notwithstanding that the purchasers were under the impression that the southern boundary ended at the Sugar River while the sellers were not sure whether or not and, just where, it might extend beyond."

The trial judge placed emphasis upon the description which the sellers placed in their proposed land contract: "413 acres of land, more or less, according to Government Survey."

The trial court found as a matter of fact that this reference to the original government survey indicated that the sellers intended to convey the whole farm as it was at the time of the original survey. His position is clearly supportable in Wisconsin law. This court has previously stated in *Wisconsin Realty Co. v. Lull* (1922), 177 Wis. 53, 62, 187 N. W. 978:

"Express reference to the United States government survey makes the plat as recorded in pursuance to the field notes, if not a substantial part of the deed, at least an appropriate source of reference in so ascertaining the real intention." In accord are *Jefferis v. East Omaha Land Co.* (1890), 134 U. S. 178, 195, 10 Sup. Ct. 518, 33 L. Ed. 872; *Cragin v. Powell* (1888), 128 U. S. 691, 696, 9 Sup. Ct. 203, 32 L. Ed. 566; Clark, *Law of Surveying and Boundaries* (3d ed.), p. 440, sec. 440; *cf. Sheppard v. Wilmott* (1891), 79 Wis. 15, 47 N. W. 1054.

The court also noted that there had been no express reservation by the vendors, although the original description would purport to convey property to the old government survey line including the 31 acres now south of the river.

It is apparent from the conduct of the vendors at the closing conference that they knew their paper title extended south of the river. At the closing conference they acknowledged that they had in fact on various occasions exercised dominion over that area as part of the Baldwin and Patterman farm. It is undisputed, and we concur

in the trial judge's conclusion, that the description as it appeared in the land contract purported to convey all of the original Lot 2 and Lot 3.

While, undeniably, there are facts that tend to support the argument of the vendors, nonetheless, the finding of the trial court that the parties intended to sell the entire Baldwin and Patterman farm of 413 acres, more or less, as it was according to the government survey, was not against the great weight and clear preponderance of the evidence. The finding, therefore, must be sustained.

*Was the vendor able to show merchantable title to Lots 2 and 3 at the time of closing*

This court in *Douglass v. Ransom* (1931), 205 Wis. 439, 446, 237 N. W. 260, defined merchantable or marketable title:

"What constitutes a marketable or merchantable (the terms are synonymous) title to real estate has been considered by this court in several cases. The general rule applicable is not difficult of statement, but it is often not easy to determine whether a particular defect falls within the rule. In the opinion of Mr. Justice PINNEY in *Harrass v. Edwards,* 94 Wis. 459, 464, 69 N. W. 69, it is stated that although a title is good, if there is reasonable doubt as to its validity it is not marketable. A material defect is such as will cause a reasonable doubt and just apprehension in the mind of a reasonably prudent and intelligent person, acting upon competent legal advice, and prompt him to refuse to accept it. If such doubt exists as to make the title subject to probable attack by legal proceedings, or depends upon facts which can only be established by parol evidence if attack is made upon it in such proceedings, the title is not marketable. In *Stack v. Hickey, supra,* it is stated that a marketable title is one that can be held in peace and quiet; not subject to litigation to determine its validity; not open to judicial doubt."

In the instant case, the alleged title defect arose out of facts which could be determined, if at all, only by resort to further testimony and parol evidence not of record.

What the vendors sought to convey and the purchasers to acquire was the entire farm, including government Lots 2 and 3. One of the defendants' witnesses, Richard H. Batterman, a surveyor, stated a "Government lot usually borders on a river or meandering stream or lake or ocean." A fractional lot is defined by Clark, *Law of Surveying and Boundaries* (3d ed.), p. 201, sec. 195, as:

". . . those irregular tracts of land designated on the plats of surveys by the land department of the government. They are to be found only in fractional sections or fractional tracts. They are formed, either, (a) . . . (b) By meandered lakes, ponds or rivers which may cover a part of a section; . . ."

It is apparent that the intended boundary "according to Government Survey" was the course of the Sugar River at the time of that survey. The evidence indicated that the Sugar River had moved northward almost a quarter of a mile during the one hundred thirty years since the government survey. There was testimony that this change could have occurred either by accretion or by avulsion.

Accretion is defined as the increase in land caused by the gradual deposit by water of material on the shores, which deposit replaces the water at this location with dry land. 3 *American Law of Property*, p. 855, sec. 15.26; 5A Thompson, *Real Property*, p. 599, sec. 2560. Professor Jacob H. Beuscher, an authority on real estate titles and water law, called as a defense witness, stated that the term, "accretion," refers to a gradual and natural accumulation of materials on the shore, so as to build up new land so that it replaces the water that was at this

location before the material was built up. If the lot is bounded by a river which gradually shifts its course by the process of accretion, the person whose land is bound by the river will gain or lose land depending upon the direction in which the river moves. *See also,* 3 *American Law of Property,* p. 856, sec. 15.27; 5A Thompson, *Real Property,* p. 599, sec. 2560; *Rondesvedt v. Running* (1963), 19 Wis. 2d 614, 620, 121 N. W. 2d 1; *Jansky v. Two Rivers* (1938), 227 Wis. 228, 236, 278 N. W. 527; *Doemel v. Jantz* (1923), 180 Wis. 225, 193 N. W. 393, 31 A. L. R. 969.

The effect of accretion is to vest title to the accreted soil in the riparian owner. Thus, if the Sugar River moved north as a result of accretion, the soil deposited upon the property of the riparian owner to the south vested in him title to the accreted soil, and to the extent that the accreted soil was derived from the riparian owner to the north (the Baldwin-Patterman farm), the riparian to the north lost title to the soil. If the change was by accretion, Baldwin and Patterman no longer had title to the point of the original government survey— the course of the river as it existed in the 1830's—but only to the present course of the river. The testimony indicated that the change of the river course also might have resulted from avulsion. Professor Beuscher stated:

"The term avulsion is used to describe a sudden change of course in a stream so that the stream shifts from its old channel to a new channel in a very short time; as for example flood stage."

A change in a water course by avulsion does not result in a change to the title of property so affected. 5A Thompson, *Real Property,* p. 612, sec. 2561; *Attorney General ex rel. Becker v. Bay Boom Wild Rice & Fur Co.* (1920), 172 Wis. 363, 178 N. W. 569. Professor Beuscher summarized the effect upon a riparian title when a water

course changed suddenly by avulsion as contrasted to the effect of a gradual change by accretion. He stated:

". . . in the case of avulsion the boundaries do not change. The boundary, if it was the thread of the original channel, continues to be there in the original channel at the thread. In the case of accretion the boundary of the land shifts as the material is built up. That is to say, the man who owns the shore against which the new material is deposited owns the material that is deposited, so that he can have continued access to the water."

Professor Beuscher was asked, in respect to fractional Lot 2: ". . . can an opinion of merchantability be stated, without knowing whether the change in the river was due to avulsion or accretion?" The witness stated that:

". . . until one knew whether the change was sudden; that is to say, was by avulsion or was by accretion, he could not determine who had title to that part of Lot 2 between the river as it flowed when the survey was originally made and the river in its present course."

He further stated that the marketability of all of Lot 2 could not be determined unless he knew whether the stream had been changed by avulsion or accretion. Professor Beuscher went on to state what is known as the doctrine of doubtful title. He said:

". . . the doctrine of doubtful title is that a buyer of land is entitled to a title that won't get him involved in litigation; and that if a title is such that it might reasonably involve litigation, then he is not required to accept it."

As stated in *Douglass v. Ransom, supra,* p. 446:

"If such doubt exists as to make the title subject to probable attack by legal proceedings, or depends upon facts which can only be established by parol evidence if attack is made upon it in such proceedings, the title is not marketable."

In the instant case, whether the purchasers had merchantable title to Lots 2 and 3 as described by the gov-

ernment survey depended upon facts unknown at the time of closing that could be proved only by parol. Whether the location of the river changed as the result of avulsion as contrasted to accretion is admittedly in doubt. There was reasonable doubt, therefore, that the title was merchantable; and, accordingly, the purchasers were justified in refusing to close the transaction upon the terms contended for by the vendors.

While opinion evidence was offered on the question of merchantability, we base our conclusion not upon the opinions offered, which were pro· and con, but rather upon the law as applied to the facts found by the trial judge. We conclude as a matter of law that the title was not merchantable.

The title insurance policy specifically excluded any guaranty of the boundaries, and in the instant case it was the location of the boundaries that constituted the nexus of the dispute. In view of all the circumstances, it was patently unreasonable for the vendors to expect the purchasers to accept the declaration of the land contract acknowledging that they are "satisfied with the title." The title binder was not in this respect sufficient to fulfill the conditions of the offer to purchase.

As a final argument, primarily posed in the reply brief of the appellants, it is contended that merchantable title is assured by secs. 893.05 and 893.06, Stats. A review of those statutes and the cases decided thereunder is indicative of the fact that these statutes are not in point. They have reference to actions to recover real property or the possession of real property. However, even if those statutes could be invoked to clarify the doubts as to merchantability, they are not applicable in this action. The title of the vendors may indeed be perfect. It may be possible that the shift in the course of the river was the result of avulsion and not of accretion. In appropriate proceedings various presumptions may be invoked in aid of the plaintiffs' title. However, issues of that nature are not before the court at this time. The question is not

what the plaintiffs may be able to prove as the result of a quiet-title action, but what the state of the record shows the condition of that title to be in view of the records presently available and the facts as now known. Anyone inspecting the record as it now stands must be assailed with reasonable doubts. Under the facts appearing herein, the title is not merchantable.

*By the Court.*—Judgment affirmed.