PLEASURE TIME, INC., Respondent, v. KUSS, and another, Appellants.

*No. 75–117.  Submitted on briefs March 30, 1977.— Decided June 1, 1977.* (Also reported in 254 N.W.2d 463.)

374

For the appellants the cause was submitted on the brief of *Edward J. Coe* and *Coe, Dalrymple & Heathman, S. S.* of Rice Lake.

For the respondent the cause was submitted on the brief of *Richard P. Tinkham* and *Tinkham, Smith, Bliss, Patterson & Richards* of Wausau.

ABRAHAMSON, J. This appeal is taken by the vendors under a land contract from a judgment in favor of the purchaser.

## I.

On November 15, 1969, Theodore Kuss and his wife Florence Kuss, the vendors, executed a land contract for the sale of real property to Pleasure Time, Inc., the purchaser, and also executed a separate Agreement for the sale of real and personal property. The essential terms of the land contract and the Agreement provided for the sale of 300 acres of land in Barron county (including buildings thereon) and personal property for $200,000. The contract required a $30,000 down payment, with the remaining $170,000 to be paid off in annual installments of $16,046.80 per year, beginning on November 1, 1970. The payments were to be applied to interest on the unpaid balance first, which was charged at seven

percent annually, and then to principal. Prepayments of principal without penalty were expressly allowed, and the Agreement provided that the purchaser could "obtain releases therefor. Any prepayment made shall be credited against the next payment or payments to principal due hereunder, as the case may be."[1] Additionally, the Agreement permitted the purchaser to pay a stated sum to the vendors and to receive in return a warranty deed for certain lands which were then released from the land contract. Each building had an assigned release price, the lakeshore lots had an assigned release price of $30 per foot of shoreline, and the non-shore lands' release price was $200 per acre.[2]

---

[1] This Agreement states: "*4. Purchase Price.*

". . . Said contract to provide for annual payments of $16,046.80 each, including interest at the rate of 7% per annum on all unpaid principal balances, said interest to commence running November 1, 1969, and the first such annual payment to be due November 1, 1970, with annual payments of $16,046.80 per year on first day of November of each year thereafter until the total principal sum and interest thereof shall be paid in full. All regular annual payments shall be applied first to the payment of interest, with the balance applied to principal. The Buyer shall have the right to prepay all or any part of the unpaid balance at any time, without penalty, and obtain releases therefor. Any prepayment made shall be credited against the next payment or payments to principal due hereunder, as the case may be."

[2] Paragraph 23 of the Agreement provided:

"23. *Releases.* It is agreed between the parties hereto that the Buyer may from time to time obtain releases of portions of the real estate described herein and that in the event of such release the Seller will furnish to the Buyer a warranty deed as called for herein as to the parcel released all in accordance with the following terms and conditions: No release shall be obtained by the Buyer until the initial total down payment of $30,000.00 has been paid by the Buyer to the Seller. Property with lake frontage shall be released from this contract and conveyed by the Seller to the Buyer upon payment by the Buyer to the Seller of an amount equal to $30.00 per front foot of lakeshore for each foot of lakeshore included in the land to be released. For the purposes hereof, the land having lakeshore access on the inlet shall be released on a price computed as if said inlet did not exist, and as if a straight line were drawn along the

Both before and after the execution of the land contract the purchaser was engaged in developing the property. The area was surveyed, roads were built, culverts installed and lots staked out. Four plats covering most of the property were recorded in August of 1970. In 1970, the vendors conveyed one entire plat, most of another (except the lakeshore areas), some lots and a building, to the purchaser for which the vendors received a $17,900 payment and a $1,300 payment.

The first annual installment payment was due on November 1, 1970; $11,090 would be interest and the balance of $4,856.80 would be principal. The purchaser applied the $19,200 ($17,000 + $1,300) to the principal part of the annual payments and made payments of interest in 1970 and in 1971. The 1970, 1971 and 1972 interest part of the annual installment payments were paid but were late. However, interest on the late interest was duly paid, and the 1973 interest portion of the annual installment was paid on time.

lakeshore connecting the ends of the mouth of said inlet. Land with buildings thereon shall be released from this contract and conveyed by the Seller to the Buyer upon payment by the Buyer to the Seller of the following amounts set opposite the respective buildings:
". . .
"It is expressly agreed, however, that the property constituting the resort and located in Government Lot 4, Section 10, Township 36 North, of Range 10 West and consisting of approximately 6 acres and including the buildings described as the house, barn, double unit and carriage house shall not be released from this contract or conveyed by the Seller to the Buyer until 40% of the total price hereunder has been paid by the Buyer to the Seller. All other property shall be released from this contract and conveyed by the Seller to the Buyer upon payment by the Buyer to the Seller of $200.00 for each acre of land so released.
"Seller shall execute all warranty deeds required hereunder in the event of release of parcels to the Buyer within ten days after submission of said deed or deeds to the Seller by the Buyer accompanied by the necessary payment and survey as hereinafter required. . . . Time is of the essence in the performance by Seller under the terms of this paragraph. . . ."

In January, 1973, the purchaser tendered and delivered to vendors a certified check in the sum of $9,850, together with a form of warranty deed to be executed by vendors for parcels to be released in exchange for such payment. The vendors retained the certified check but have failed and refused to execute and deliver the warranty deed.

The vendors argued then, as now, that the agreement requires annual installment payments of $16,046.80, regardless of any release payments made, and the purchaser is in default. The purchaser contends that its prepayment of principal and its tender should be applied to the principal part of each annual installment due, and accordingly it has complied with the Agreement and is entitled to releases. The trial court concluded, and we agree, that the purchaser's interpretation of its contractual obligation is the correct one.

The construction of a written contract is normally a matter of law for the court, although in a case of ambiguity in a written contract where words or terms are to be construed by extrinsic evidence, then the question is one for the trier of fact. *RTE Corp. v. Maryland Casualty Co.*, 74 Wis.2d 614, 621, 247 N.W.2d 171 (1976). The contract is to be considered as a whole in order to give each of its provisions the meaning intended by the parties. *Ketay v. Gorenstein*, 261 Wis. 332, 53 N.W.2d 6 (1952); *State ex rel. Department of Agriculture & Markets v. Badger Dairy, Inc.*, 245 Wis. 229, 232, 14 N.W.2d 34 (1944). If the construction is a question of law it may be redetermined independently by this court on appeal. *Zweck v. D P Way Corp.*, 70 Wis.2d 426, 435, 436, 234 N.W.2d 921 (1975). If the construction is a question for the trier of fact, this court will not disturb such finding unless it is contrary to the great weight and clear preponderance of the evidence. *Baldwin v. Anderson*, 40 Wis.2d 33, 41, 161 N.W.2d 553 (1968).

At the demurrer stage of this case, the trial court held that the contract was unambiguous and that as a matter of law, the contract required the payments for release of specific parcels be credited against any payments due or to become due on principal. At a trial before the judge, extrinsic evidence was introduced bearing on the meaning of the Agreement. The testimony of the parties and prior unsigned drafts of the Agreement were put into evidence. A prior draft expressly provided that prepayments for releases would not be considered prepayments of the annual principal installment.[3] The trial court viewed the omission of this language in the final draft as a deliberate decision that prepayments for releases would apply to principal. The trial court, recognizing the difficulty of reconsidering its prior ruling, went on to reconsider the issue in view of the extrinsic evidence and opined that "it comes to the same decision, only feeling more sure of itself this time."

We hold that the trial court did not err, as an issue of fact or law, in determining that payments for releases were to be credited against the annual principal installment.

## II.

The vendors counterclaimed for "foreclosure of the land contract and sale"[4] based on three alleged defaults

---

[3] This court has held that it is proper to consider the conduct of the parties and the negotiations which took place, both before and after the execution of the documents, and all related documents of the parties. *Smith v. Osborn*, 66 Wis.2d 264, 274, 223 N.W.2d 913 (1974). *See also, H. & R. Truck Leasing Corp. v. Allen*, 26 Wis.2d 158, 163, 131 N.W.2d 912 (1965).

[4] Perhaps the counterclaim might better be described as one for specific performance. For a discussion of the remedies of the vendor under a land contract, *see* MacDonald and De Witt, 1 Wisconsin Practice, sec. 313 (3d ed. 1973).

by the purchaser: waste, failure to make payments timely and the bankruptcy of a guarantor. The vendors allege that the purchaser should be found in default because it committed waste on the property. They claim that some buildings were totally or partially demolished and that there was serious deterioration of several other buildings.

Waste may be defined as the unreasonable conduct by the owner of a possessory estate that results in physical damage to the real estate and substantial diminution in the value of the estates in which others have an interest. *See* Burby, *Real Property*, sec. 12, p. 33 (1965); 4 Thompson on Real Property, secs. 1853, 1855 (1961 Repl. vol.). *Cf.* Restatement of Property, secs. 138, *et seq.* Whether a particular act is waste depends on the circumstances.

The trial judge viewed the premises at the commencement of the trial. The judge found certain buildings had been destroyed, but they were on lands released to the purchaser or in the platted road and the vendors had joined in the platting documents, or of less than $500 value. Other buildings were not being repaired, but as the trial judge noted, the parties had contemplated that the land would be subdivided and that the property would no longer be operated as a farm or as a resort. The evidence was that buildings having potential future value in the development were kept in good repair, and those which needed repairs—*e.g.*, roofing—were awaiting either demolition or remodeling at an economically feasible opportunity. The purchaser claimed it had spent about $100,000 in the development of the land which had enhanced the value of the land. The property was valued as about $700,000 at the time of trial by an independent appraiser, whose testimony indicated that this increase beyond the $200,000 purchase price resulted from the platting activities making lots available for sale. The

court noted that the outstanding balance of the land contract was about $138,500, substantially less than the value of the security.

In this state the question of the existence of waste is for the trier of fact. *Melms v. Pabst Brewing Co.*, 104 Wis. 7, 16, 179 N.W. 738 (1899). The trial court found no waste in the case at bar that would constitute default and, as this finding is supported by sufficient credible evidence described above, we leave it undisturbed.

The vendors further allege that the purchaser defaulted by making late principal and interest payments, by allowing the insurance coverage to lapse and by permitting the property tax payments to become delinquent. The trial court, however, found that these deficiencies were substantially corrected when the action was commenced, thereby removing the purchaser from default status on these grounds.

The vendors' third ground for foreclosure is that one of the guarantors of the Agreement was adjudged bankrupt in March, 1972. The language of the Agreement was ambiguous as to the effect of the bankruptcy of a guarantor, and the trial court determined that it was the intent of the parties that the bankruptcy of a guarantor constitutes a default under the contract. After the bankruptcy, the vendors demanded and accepted several interest payments from the purchaser without claiming a default. The purchaser also made payment of taxes and further improvements on the property. The trial court said "it does not seem equitable that [vendors] could wait almost two years after knowledge of the fact of the bankruptcy, accepting two very substantial payments under the contract during that time, and thereafter asserts [sic] that such matter is a ground for foreclosure."

This court has stated that a mortgage foreclosure is an equitable remedy and that the court should balance the equities between the parties to determine if foreclosure is merited. *Mutual Fed. S. & L. Assoc. v. Wisconsin Wire Works*, 58 Wis.2d 99, 110–112, 205 N.W.2d 762 (1973); *Mutual Fed. S. & L. Assoc. v. American Medical Services*, 66 Wis.2d 210, 216, 220, 223 N.W.2d 921 (1974). We believe a similar rule applies here. The balancing of the equities led the trial court to conclude that it would be inequitable to permit foreclosure of the land contract.[5] We find nothing in the record to justify reversing the trial court's decision in that regard.

---

[5] The trial court's opinion on the bankruptcy issue did not refer specifically to the equitable defenses of laches and estoppel. We would find them applicable here. The elements of the defense of laches are set forth in *Wisconsin Bridge & Block Corp. v. Vogel*, 54 Wis.2d 321, 195 N.W.2d 664 (1972):

"The elements of laches are a cause of action against the defendant, an unreasonable delay and prejudice to the defendant resulting from the delay. *McDonald v. McDonald*, 53 Wis.2d 371, 192 N.W.2d 903 (1972); 27 Am. Jur.2d, *Equity*, p. 701, sec. 162."

In addition, the party sought to be barred must be shown to have had knowledge of the course of event and acquiescence therein. *Mutual Federal Savings & Loan Asso. v. American Medical Services*, 66 Wis.2d 210, 218, 223 N.W.2d 921 (1974). All of those elements are present here.

The bankruptcy filing occurred March 9, 1972. At that point the vendors had a cause of action. Their counterclaim was filed February 28, 1974. During the intervening twenty-three months vendors made numerous demands upon the purchaser for payments under the contract. A foreclosure action was threatened but on grounds other than bankruptcy. There was no indication of concern over the bankruptcy for a substantial period after it occurred, and the vendors accepted the purchaser's performance under the contract.

Estoppel would also be an applicable defense. The elements of estoppel were stated by this court in *Gabriel v. Gabriel*, 57 Wis.2d 424, 429, 204 N.W.2d 494 (1973):

## III.

The trial court ordered specific performance of the land contract, namely the execution and delivery to the purchaser of a warranty deed for the lots requested. The court further ordered that the vendors pay $17,-136.39 damages to the purchaser. The vendors object to the trial court's awarding both damages and specific performance and to the amount of the damages awarded.

Damages are not inconsistent with the demand for specific performance, where, as here, there was a delay during which the vendors did not perform and for which a decree of specific performance affords no relief. *James L. Callan, Inc. v. Estfred Corp.*, 21 Wis.2d 1, 5, 6, 123 N.W.2d 446 (1963) ; *Dells Paper & Pulp Co. v. Willow River Lumber Co.*, 170 Wis. 19, 37, 173 N.W. 317 (1919). *See also*, 5A *Corbin on Contracts*, sec. 1143, p. 126 (1964) ; 11 *Williston on Contracts*, sec. 1430, p. 877 (3d ed. Jaeger, 1968).

There is also express language in the Agreement which allows the injured party to seek multiple remedies:

"The tests for applicability of equitable estoppel as a defense derive from the definition by this court of such estoppel to be: '. . . action or nonaction on the part of the one against whom the estoppel is asserted which induces reliance thereon by another, either in the form of action or nonaction, to his detriment. . . .' Three facts or factors must be present: (1) *Action or nonaction* which induces (2) *reliance* by another (3) to his detriment." (citing *City of Milwaukee v. Milwaukee County*, 27 Wis.2d 53, 66, 133 N.W.2d 393 (1965). (Emphasis in original.)

Vendors treated the contract as continuing and demanded the purchaser continue payments under the contract. In reliance thereon the purchaser continued (albeit at a slow pace) with the development plans and remitted interest per the contract. The detriment to the purchaser from the payment of these sums, if foreclosure were allowed, is apparent.

". . . The parties further agree that in the event of the failure to perform any agreement required by them hereunder, money damages payable to the other party will not be adequate to compensate in full for actual damages sustained by such default, and that, accordingly, the party alleging such default shall be entitled in addition to an action for damages to specific performance of [sic] such other legal or equitable remedies as may be available in order to enforce the agreements herein contained."

However, the vendors' attack on the amount of damages awarded has merit.

The purchaser attempted to prove damages in the sum of $214,173, based on calculations of a reasonable rate of return on its investment during the period lots were withheld, "unrecoverable expenses" and the "time value" of money. The purchaser's reasoning and figures are unpersuasive to prove the amount of losses or that the "losses" claimed resulted from the vendors' breach.[6] Also allowance of damages in the amount claimed would violate, as the trial court noted, the rule that contract damages are compensatory; their purpose is to compensate the injured party for losses necessarily and foreseeably flowing from the breach, but the damaged party is not entitled to be placed in a better position because of a damage award than he or she would have been had the contract been performed. Damages are not to

[6] Note the court's comments in *Hope Acres, Inc. v. Harris*, 27 Wis.2d 285, 297, 298, 134 N.W.2d 462 (1965), which also involved the vendors' refusal to convey lots:

"At no time, however, did appellant produce evidence establishing that any of this expense was actually lost due to the refusal of respondents to convey the lots. It is impossible to glean from the record which of the expenses listed in the compendium amounted to damages and which were ordinary business outlays not connected in any way to respondents' conduct or payments related to the sale of lots which respondents had conveyed."

serve as punishment for the defendant. *Hanz Trucking, Inc. v. Harris Brothers Co.*, 29 Wis.2d 254, 268, 138 N.W.2d 238 (1965) ; *Dehnart v. Waukesha Brewing Co.*, 21 Wis.2d 583, 595, 124 N.W.2d 664 (1963).

The purchaser further alleged that by reason of the vendors' failure to convey the parcels it has been unable to conclude sales of real estate as contracted for and has lost profits it would otherwise have realized and that its credit and business reputation has been damaged.[7] Although the trial court's findings of fact include a finding that the purchaser was damaged by its inability to proceed with orderly development of the property and to complete sales of parcels, the trial court's first memorandum opinion comments that the purchaser did not sustain its burden of showing that it lost sales and that it did not prove the extent of its damages by such loss; the purchaser did not show "what would have happened between the time of the refusal to convey and the commencement of this action if there had been no such refusal."

We have reviewed the record. While there was some testimony that the purchaser had received offers for certain properties for specific amounts, the evidence was meager and uncertain as to what damage did result from the breach and the amount thereof. The record affords no reasonable basis for measuring damages. *See Wolf v. Cohen,* 379 F.2d 477, 479 (D.C. Cir. 1967) ; *Quick v. Pointer,* 186 F.2d 355 (D.C. Cir. 1950). Any attempt

---

[7] For a discussion of proof of purchaser's loss of profits as a result of its inability to sell land or its suffering a decrease in the value of the lots between the time when the lots were requested and the date of conveyance, *see* 11 *Williston on Contracts,* sec. 1390 (3d ed. Jaeger, 1968); Annot., *Vendor and Purchaser: Recovery for Loss of Profits from Contemplated Sale or Use of Land, Where Vendor Fails or Refuses to Convey,* 11 A.L.R.3d 719 (1967); Annot., *Measure of Vendee's Recovery in Action for Damages for Vendor's Delay in Conveying Real Property,* 74 A.L.R.2d 578 (1960).

to calculate damages on the basis of the record before us is uncertain and wholly speculative. *See Toulon v. Nagle,* 67 Wis.2d 233, 254, 226 N.W.2d 233 (1975) ; 5 *Corbin on Contracts,* sec. 1022 (1964). The only damage that is apparent on the record is that the purchaser lost interest on $9,850, the sum tendered by the purchaser for the deed requested.

The trial court, faced with this lack of evidence on which to base an award for damages, attempted to award damages on what it believed fair and equitable grounds. The trial court calculated damages in the amount of $17,136.39, which is the interest paid by the purchaser on the principal balance of the land contract from January 31, 1973 (the approximate date of vendors' breach) to November 1, 1974 (a short time before the trial court's decision), and relieved the purchaser of its obligation to pay any interest on principal until the lots in question were released.

Although this may be a difficult case in which to prove precise dollar values, the burden rests on the purchaser to prove by credible evidence to a reasonable certainty that damages were suffered and to establish at least to a reasonable probability the amount of these damages. *Naden v. Johnson,* 61 Wis.2d 375, 387, 212 N.W.2d 585 (1973). In *De Sombre v. Bickel,* 18 Wis.2d 390, 398, 118 N.W.2d 868 (1963), we said:

"Neither a court nor a jury as the trier of the facts can determine damages by speculation or guesswork. The trier of fact may make a reasonable estimate of the damage based on relevant date and evidence . . . . Damages must be proven with reasonable certainty. *Maslow Cooperage Corp. v. Weeks Pickle Co.* (1955), 270 Wis. 179, 70 N.W. (2d) 577. True, some type of damage is difficult of proof but the difficulty does not excuse the failure to put into evidence some reasonable basis of computation."

On the basis of the record before us, we find that the trial court's calculation of damages is speculative, and the vendors should be awarded a new trial limited to the issue of damages.

*By the Court.*—The judgment is affirmed as to the judgment for specific performance, the declaratory judgment and the judgment dismissing the counterclaim; the judgment for damages is reversed and the cause is remanded for a new trial on the issue of damages only.