**Dennis FRANDSEN, Plaintiff-Appellant,**

v.

**JENSEN–SUNDQUIST AGENCY, INC. and First Wisconsin Corporation, Defendants-Appellees.**

**Nos. 85–2622, 85–2293 and 85–3190.**

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1986.

Decided Oct. 1, 1986.

Maclay R. Hyde, Bassford Heckt Lockhart & Mullin, Minneapolis, Minn., for plaintiff-appellant.

Thomas L. Shriner, Jr., Foley & Lardner, Milwaukee, Wis., Steven C. Schroer, Faegre & Benson, Minneapolis, Minn., for defendants-appellees.

Before POSNER and FLAUM, Circuit Judges, and MAROVITZ, Senior District Judge.*

POSNER, Circuit Judge.

The appeals in this diversity suit require us to consider issues of Wisconsin contract and tort law in the setting of a dispute over the rights of a minority shareholder in a closely held corporation. The facts are as follows. In 1975 Walter Jensen owned all the stock of Jensen-Sundquist Agency, Inc., a holding company whose principal asset was a majority of the stock of the First Bank of Grantsburg; Jensen-Sundquist also owned a small insurance company. That year Jensen sold 52 percent of his stock in the holding company to members of his family—the "majority bloc," as we shall call them and the interest they acquired; 8 percent to Dennis Frandsen, a substantial businessman who was not a member of Jensen's family and who paid Jensen $97,000 for the stock; and the rest, in smaller chunks, to other non-family members. By a stockholder agreement drafted by Jensen and a lawyer representing the bank and Jensen's family, the majority bloc agreed "that should they at any time offer to sell their stock in Jensen-Sundquist, Inc., ... they will first offer their stock to [Frandsen and six other mi-

* Hon. Abraham L. Marovitz of the Northern District of Illinois, sitting by designation.

nority shareholders who had negotiated for this provision] at the same price as may be offered to [the majority bloc] ... and ... they will not sell their stock to any other person, firm, or organization without first offering said stock" to these minority shareholders "at the same price and upon the same terms." The majority bloc also agreed not to "sell any of their shares to anyone without at the same time offering to purchase all the shares of" these minority shareholders "at the same price." Thus if the majority bloc offered to sell its shares it had to give Frandsen a right to buy the shares at the offer price. If Frandsen declined, the second protective provision came into play: the majority bloc had to offer to buy his shares at the same price at which it sold its own shares.

In 1984 the president of Jensen-Sundquist began discussions with First Wisconsin Corporation, Wisconsin's largest bank holding company, looking to the acquisition by First Wisconsin of First Bank of Grantsburg, Jensen-Sundquist's principal property. A price of $88 per share of stock in the First Bank of Grantsburg was agreed to in principle. The acquisition was to be effected (we simplify slightly) by First Wisconsin's buying Jensen-Sundquist for cash, followed by a merger of First Bank of Grantsburg into a bank subsidiary of First Wisconsin. Each stockholder of Jensen-Sundquist would receive $62 per share, which would translate into $88 per share of the bank. (The reasons that the share values were not the same were that there were more holding company shares than bank shares and that the holding company had another asset besides the bank—the insurance company.) Jensen-Sundquist asked each of the minority shareholders to sign a waiver of any rights he "may have" in the transaction, rights arising from the stockholder agreement, but advised each shareholder that in counsel's opinion the shareholder had no rights other than to receive $62 per share.

Each of the minority shareholders except Frandsen signed or was expected to sign the waiver. Frandsen not only refused to sign but announced that he was exercising his right of first refusal and would buy the majority bloc's shares at $62 a share. (He also offered to buy out the other minority shareholders.) The majority did not want to sell its shares to him—Frandsen says because the president of Jensen-Sundquist, who was also the chairman of the board of First Bank of Grantsburg and a member of the majority bloc, was afraid he would lose his job if Frandsen took over. The deal was restructured. Jensen-Sundquist agreed to sell its shares in First Bank of Grantsburg to First Wisconsin at $88 a share and then liquidate, so that in the end all the stockholders would end up with cash plus the insurance company and First Wisconsin would end up with the bank, which was all it had ever wanted out of the deal. All this was done over Frandsen's protest. He then brought this suit against the majority bloc, charging breach of the stockholder agreement, and against First Wisconsin, charging tortious interference with his contract rights. The district judge granted summary judgment for the defendants and Frandsen appeals.

The interpretation of an unambiguous contract is a question of law. *Koenings v. Joseph Schlitz Brewing Co.*, 126 Wis.2d 349, 366, 377 N.W.2d 593, 602 (1985). The practical significance of this principle is that the question of interpretation is answered by the judge rather than the jury; we need not pause to consider whether this result is desired because judges are thought particularly expert in the interpretation of documents, or because an unambiguous document can by definition be interpreted in only one way (though it may take a skillful reading to arrive at the correct interpretation, see *Amoco Oil Co. v. Ashcraft*, 791 F.2d 519, 521 (7th Cir. 1986)), or because the law seeks to protect contracting parties from the vagaries of juries, which may be swayed by extrinsic factors such as sympathy for an individual's human predicament or hostility to a large enterprise. When, however, the meaning of a contract is inscrutable without oral evidence—evidence for example on the meaning of terms that the contract

does not use in their ordinary dictionary senses—there must be a trial, and the issue of interpretation gets resolved by the jury. See *Pleasure Time, Inc. v. Kuss,* 78 Wis.2d 373, 379, 254 N.W.2d 463, 467 (1977); *Central Auto Co. v. Reichert,* 87 Wis.2d 9, 19, 273 N.W.2d 360, 364–65 (Ct.App.1978); *Western Industries, Inc. v. Newcor Canada Ltd.,* 739 F.2d 1198, 1205 (7th Cir. 1984). Frandsen was therefore entitled to a trial on his breach of contract claim if but only if the stockholder agreement was not clear enough for the judge to be able to decide, on the basis of the agreement itself and the undisputed background facts, whether Frandsen's right of first refusal had been violated.

■ The case would be easy if the transaction had been structured from the start as a simple acquisition by First Wisconsin of First Bank of Grantsburg from Jensen-Sundquist. Nothing in the stockholder agreement suggests that any minority shareholder has the right to block the sale by Jensen-Sundquist of any of its assets, including its principal asset, a controlling interest in First Bank of Grantsburg. The right of first refusal is a right to buy the shares of the majority bloc in Jensen-Sundquist if they are offered for sale, and there would be no offer of sale if Jensen-Sundquist simply sold some or for that matter all of its assets and became an investment company instead of a bank holding company. Nor did the contract entitle Frandsen to insist that the deal be configured so as to trigger his right of first refusal. Cf. *Hariton v. Arco Electronics, Inc.,* 41 Del.Ch. 74, 188 A.2d 123 (1963); *Orzeck v. Englehart,* 41 Del.Ch. 361, 195 A.2d 375, 377–78 (1963); *Moran v. Household Int'l, Inc.,* 490 A.2d 1059, 1077 (Del.Ch.1985), aff'd, 500 A.2d 1346 (Del.S.Ct.1985); *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 943–48 (5th Cir.1981) (en banc).

The case is a little harder because the transaction was originally configured as a purchase of the holding company rather than just of the bank, an asset of the holding company. Compare Wis.Stat. §§ 180.62–180.67 with *id.,* § 180.71. And Frandsen points out that under the stockholder agreement his right of first refusal was triggered by an *offer,* so that the fact the offer was later withdrawn would not affect his right of first refusal if he had already tried to exercise it—and he had tried, before the defendants reconfigured the transaction. But the point is academic, because we agree with the district judge that there never was an offer within the scope of the agreement. The part of the agreement that grants a right of first refusal refers to an offer to sell "their stock," and to a sale of "their stock," and the "their" refers to the majority shareholders. They never offered to sell their stock to First Wisconsin. First Wisconsin was not interested in becoming a majority shareholder of Jensen-Sundquist, in owning an insurance company, and in dealing with Frandsen and the other minority shareholders. It just wanted the bank.

■ What is more, a sale of stock was never contemplated, again for the reason that First Wisconsin was not interested in becoming a shareholder of Jensen-Sundquist. The transaction originally contemplated was a merger of Jensen-Sundquist into First Wisconsin. In a merger, as the word implies, the acquired firm disappears as a distinct legal entity. *Leannais v. Cincinnati, Inc.,* 565 F.2d 437, 439 (7th Cir. 1977); 2 Model Business Corp. Act Ann. 1231 (3d ed. 1985). In effect, the shareholders of the merged firm yield up all of the assets of the firm, receiving either cash or securities in exchange, and the firm dissolves. See Wis.Stat. §§ 180.62, 180.67. In this case the shareholders would have received cash. Their shares would have disappeared but not by sale, for in a merger the shares of the acquired firm are not bought, they are extinguished. There would have been no Jensen-Sundquist after the merger, and no shareholders in Jensen-Sundquist.

The distinction between a sale of shares and a merger is such a familiar one in the business world that it is unbelievable that so experienced a businessman as Frandsen would have overlooked it. It is true that

he was not represented by a lawyer in connection with the stockholder agreement, but when an experienced businessman deliberately eschews legal assistance in making a contract he cannot by doing so obtain a legal advantage over a represented party should a dispute arise.

■ Nor are we persuaded by Frandsen's argument that if interpreted literally the stockholder agreement gave him no right of first refusal worthy of the name. It is true that under that interpretation if as happened the majority bloc did not want to sell out to him, all it had to do was find a merger partner. But these alternatives are not identical in all but form, as he argues. The majority bloc was only 52 percent. If the majority wanted to sell its stock to someone who wanted a controlling interest in the company rather than the company itself or an asset of the company such as the First Bank of Grantsburg, it had to offer its shares to Frandsen first (and to the other six minority shareholders who had a right of first refusal—what would have happened if all had exercised their right we need not speculate about). If it wanted to bypass Frandsen it had to find someone willing to buy not just its shares, but the company.

Most important, Frandsen may have been concerned not with a sale of the company itself at a price agreeable to a majority and therefore likely to be attractive to him as well, but with a sale of the majority bloc that would leave him a minority shareholder in a company owned by strangers. The lot of a minority shareholder in a closely held company is not an enviable one, even in the best of circumstances. A majority coalition may gang up on him. And he may not have the usual recourse of a victimized minority shareholder—to sell out. For there may be no market for his shares, except the very people who have ganged up on him. See Easterbrook & Fischel, *Close Corporations and Agency Costs*, 38 Stan.L.Rev. 271 (1986); William A. Gregory, *Stock Transfer Restrictions in Close Corporations*, 1978 So.Ill.U.L.J. 477. Frandsen may just have wanted to protect himself against being put at the mercy of a new and perhaps hostile majority bloc. The right of first refusal was one protection against this danger.

Against this Frandsen argues that the right of first refusal must have had an additional purpose, for otherwise it would merely have duplicated the second protective provision in the stockholder agreement, which guaranteed that the majority bloc if it sold its shares would offer to buy his shares at the same price. It is true that this provision protected Frandsen against finding himself a minority shareholder in a company controlled by persons other than the members of the original majority bloc, but it did so at the price of forcing him to leave the company. The right of first refusal enabled him to remain in the company by buying out the majority bloc at the same price that the bloc was willing to sell its shares to others. It thus gave him additional protection. It did not give him protection against a sale of the company itself but this does not make the agreement incoherent or unclear, for his only concern may have been with the possibility of finding himself confronted with a new majority bloc, and that is the only possibility he may have thought it important to negotiate with reference to.

■ We note in this connection that Frandsen himself had once taken over a bank by paying a premium to a majority of shareholders and then, after he acquired control in this way, buying out the minority shareholders at a lower price. Evidently he wanted to make sure that no one did this to him in Jensen-Sundquist by buying the majority bloc and then making life uncomfortable for him and the other minority shareholders so that they would sell their shares on the cheap. The stockholder agreement that he negotiated with Jensen was well designed to protect him against a maneuver that he had practiced himself. The defendants' efforts to get Frandsen to sign a waiver do not as he argues establish a practical construction of the stockholder agreement as entitling him to exercise his right of first refusal in the event of a

proposed merger. A waiver is like a quit-claim deed: the signer waives whatever rights he may have, but does not warrant that he has any rights to waive.

Frandsen's principal argument is that the word "sell" is sufficiently ambiguous to embrace a disposition that has the same practical effect as a sale of the majority bloc's shares. This may be; *Wilson v. Whinery*, 37 Wash.App. 24, 28–29, 678 P.2d 354, 357 (1984), held that a transfer of all beneficial use of parcel B, "thereby granting [the transferee] substantial control over parcel B," was a sale of B for purposes of a right of first refusal triggered by such a sale. But our main point has been that a sale of the majority bloc's shares is not the same thing as a sale of either all or some of the holding company's assets. The sale of assets does not result in substituting a new majority bloc, and that is the possibility at which the protective provisions are aimed. This appears with sufficient clarity, moreover, to justify the district judge's refusal to go outside the text of the contract to find its meaning.

■ Any lingering doubts of the propriety of this course are dispelled by the rule that rights of first refusal are to be interpreted narrowly. See *Rychwalski v. Milwaukee Candy Co.*, 205 Wis. 193, 236 N.W. 131 (1931); *Engel v. Teleprompter Corp.*, 703 F.2d 127, 134 (5th Cir.1983); *United States v. Adkins-Phelps, Inc.*, 400 F.2d 737, 741 (8th Cir.1968); *Globe Slicing Machine Co. v. Hasner*, 333 F.2d 413, 415 (2d Cir.1964); cf. *Edlin v. Soderstrom*, 83 Wis.2d 58, 69–71, 264 N.W.2d 275, 280 (1978). This may seem to be one of those fusty "canons of construction" that invite ridicule because they have no basis and contradict each other and are advanced simply as rhetorical flourishes to embellish decisions reached on other, more practical grounds. See, e.g., Llewellyn, The Common Law Tradition: Deciding Appeals 521–35 (1960); Note, *Intent, Clear Statements and the Common Law: Statutory Interpretation in the Supreme Court*, 95 Harv. L.Rev. 892 (1982). But actually it makes some sense. The effect of a right of first refusal is to add a party to a transaction, for the right is triggered by an offer of sale, and the effect is therefore to inject the holder of the right into the sale transaction. Adding a party to a transaction increases the costs of transacting exponentially; the formula for the number of links required to connect up all the members of an n-member set is $n(n-1)/2$, meaning that, for example, increasing the number of parties to a transaction from three to four increases the number of required linkages from three to six. Certainly the claim of a right of first refusal complicated the transaction here! If all the costs of the more complicated transaction were borne by the parties, it would hardly be a matter of social concern. But some of the costs are borne by the taxpayers who support the court system, and the courts are not enthusiastic about this, and have decided not to be hospitable to such rights. The right is enforceable but only if the contract clearly confers it.

■ In any event this rule of interpretation is well established in Wisconsin and hence beyond our power to question in this diversity case; and it reinforces the conclusion that Frandsen's right of first refusal was not triggered by a proposal to merge Jensen-Sundquist into First Wisconsin, and even more clearly not by the actual transaction, whereby First Wisconsin bought Jensen-Sundquist's bank and Jensen-Sundquist then liquidated. Although we find no Wisconsin case on point (thus necessitating this extended analysis), a number of cases from other jurisdictions hold that a sale of the corporation's assets does not trigger a right of first refusal applicable to the corporation's stock. See, e.g., *Dobry v. Dobry*, 262 P.2d 691 (Okla.1953); cf. *Shields v. Shields*, 498 A.2d 161, 167–70 (Del.Ch. 1985); *K.C.S., Ltd. v. East Main Street Land Development Corp.*, 388 A.2d 181 (Md.Ct.Spec.App.1978).

■ One case gives us pause. *McCarthy v. Osborn*, 223 La. 305, 65 So.2d 776 (1953), held that a sale of a corporation violated the plaintiff's right of first refusal (a right conditioned as in this case on a sale

of the corporation's shares, not assets), since the effect of the sale was to convey the stock as well as assets of the corporation. What happened here was the sale by the corporation (Jensen-Sundquist) of its asset, the First Bank of Grantsburg, a sale that left Jensen-Sundquist, and Frandsen's stock in Jensen-Sundquist, intact, followed by Jensen-Sundquist's liquidating, which left Frandsen with cash, thus in a sense accomplishing in two steps what the defendants in *McCarthy v. Osborn* had accomplished in one. But nothing in Frandsen's right of first refusal was intended to protect him against liquidation. As we have stressed, the danger against which the right protected him was that the majority bloc might be sold to a new majority, leaving him a minority shareholder confronted by persons whom he might distrust. Liquidation eliminated that danger. If the distinction seems somewhat formalistic, this is an area of law where formalitites are important, as they are the method by which sophisticated businessmen make their contractual rights definite and limit the authority of the courts to redo their deal. Cf. *Engel v. Teleprompter Corp.*, *supra*, 703 F.2d at 134.

 If as we believe no contractual right of Frandsen's was violated by the transaction, it is more than difficult to see how First Wisconsin could have been guilty of a tortious interference with his contractual rights. It is true that this tort has undergone a steady expansion and now embraces situations in which the interference is not with a contract right but merely with an expectation. See *Cudd v. Crownhart*, 122 Wis.2d 656, 364 N.W.2d 158 (Ct.App. 1985); 2 Harper, James & Gray, The Law of Torts §§ 6.5–.11 (2d ed.1986). But expansion is limited by the pressure of competing policies. One of the most firmly established principles of the common law is that competition is not a tort. See *Keeble v. Hickeringill*, 11 East. 574, 103 Eng.Rep. 1127 (K.B. 1706 or 1707). Although competition literally is an intentional interference with competitors' prospective contractual relations, to conclude that it is therefore a tort would be as unsound legally as it

would be disastrous economically. The courts have not drawn this conclusion; instead they have ruled that while competition is not a defense to a charge of interfering with an existing contract (for a firm should have no right to compete by inducing its competitors' customers to break valid contracts), it is a defense to a charge of interfering with prospective contractual relations, provided it is fair competition, consistent with antitrust law and other principles. Restatement (Second) of Torts § 768 (1979); 2 Harper, James & Gray, The Law of Torts § 6.13, at pp. 355–56 (2d ed.1986). Competition means little if it does not mean competing for a rival's existing customers (provided they are not tied to him by contract) as well as for customers new to the market. First Wisconsin and Frandsen were competitors to acquire the First Bank of Grantsburg. As long as First Wisconsin did not violate the antitrust laws or other relevant laws or induce First Bank's owner, Jensen-Sundquist, to break the stockholder agreement, First Wisconsin was entitled to compete for this prize without worrying that its rival, Frandsen, if he lost the competition, would turn around and sue in an effort to take away the prize.

The principal function of the concept of tortious interference is to provide a back-up remedy against breaches of contract. Suppose that Frandsen had had an employment contract with Jensen-Sundquist and First Wisconsin had induced him to break it. Jensen-Sundquist could sue Frandsen for breach of contract but the suit might have little practical value because an individual employee will often be judgment-proof. Or suppose Jensen-Sundquist's workmen's compensation carrier persuaded it to fire Frandsen by falsely advising Jensen-Sundquist that Frandsen had a serious risk of being injured at work. See *American Surety Co. v. Schottenbauer*, 257 F.2d 6 (8th Cir.1958). Frandsen could still sue Jensen-Sundquist for breach of contract rather than tortious interference, but even so, the tort would enable Jensen-Sundquist, via the doctrine of indemnity, to shift the

cost of the breach to the primary wrong-doer, the insurance carrier.

In cases where no breach of contract results from the interference, the tort is really a branch of the law of unfair competition, and it is necessary for liability that the alleged tortfeasor have gone beyond the accepted norms of fair competition. For First Wisconsin to want to acquire First Bank of Grantsburg from Jensen-Sundquist and to make suggestions for how the sale could be carried out in a way that would violate nobody's legal rights would not violate the norms of fair competition; it would exemplify them.

The district judge correctly dismissed all of Frandsen's claims.

AFFIRMED.